*Judge Gardephe*

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**



08 CIV 7105

| | |
|---|---|
| PPL ENERGYPLUS, LLC : | Civil Action No. _____ |
| Plaintiff, : | |
| v. : | **COMPLAINT** |
| SARACEN MERCHANT ENERGY, LP : | AUG 08 2008 |
| Defendant. : | U.S.D.C. S.D. N.Y. CASHIERS |

Plaintiff PPL EnergyPlus, LLC ("PPL EnergyPlus"), by and through its attorneys

Sonnenschein Nath & Rosenthal LLP, alleges as follows for its complaint against defendant

Saracen Merchant Energy, LP ("Defendant" or "Saracen"):

## NATURE OF THE ACTION

1.    On or about May 12, 2005, the United States Environmental Protection Agency

("EPA") issued the "Clean Air Interstate Rule" (hereinafter, "CAIR"), in an attempt to (among

other things) limit in a 28-state area (and the District of Columbia) the emission of sulfur dioxide

("SO2") and nitrogen oxides ("NOx") into the atmosphere for the purpose of helping the region

attain national ambient air quality standards for ozone and fine particulates.

2.    At issue in this case are the CAIR requirements for reducing annual NOx

emissions that contribute to the formation of fine particulates throughout the year, known as the

annual NOx program.  NOx also contributes to formation of ozone only in the warm summer

months, and there are separate requirements in CAIR and other regulations to control NOx

emissions in the summer months.  CAIR also includes separate requirements to address the

contribution of SO2 to the formation of fine particulate matter, which are not pertinent here.

3.    Under CAIR, EPA issued annual allowances for NOx emissions.    Starting in

January 2009, electric generating units ("EGUs") were to be required to surrender one annual

allowance for each ton of NOx emitted through the year. Those allowances could be freely traded. With trading, some EGUs could commit to operating their NOx controls throughout the year to make greater reductions than needed so that they can sell their extra allowances, directly or indirectly, to other EGUs that are not able to make reductions as cost-effectively.

4.      PPL EnergyPlus and Saracen entered into a contract whereby Saracen had an option to sell a number of NOx "Annual Allowances" to PPL EnergyPlus at a specific price (the "Contract").

5.      "Annual Allowance" is defined by the Contract as, "the authorization from the [EPA] . . . pursuant to [CAIR] . . . to emit one ton of [NOx] in a calendar year, beginning 2009."

6.      The Contract also provides that if governmental action eliminates Annual Allowances under CAIR's NOx program, then either party may terminate the Contract on written notice to the other party.

7.      On July 11, 2008, the United States Court of Appeals for the District of Columbia Circuit (the "DC Circuit Court"), which has exclusive jurisdiction to determine the legality of CAIR, vacated CAIR in its entirety. Accordingly, with CAIR vacated, there is no requirement that EGUs surrender allowances for each ton of NOx emitted throughout the year, and no NOx allowances issued pursuant to the rules, and no provisions for transferring NOx allowances from one EGU's account to another. In short, there are no CAIR requirements to reduce NOx emissions and the "Annual Allowances" issued pursuant to CAIR thus no longer exist.

8.      In this action, PPL EnergyPlus seeks, among other things, a judicial declaration that based on the vacatur of CAIR it is impossible for Saracen to transfer NOx Annual Allowances to PPL EnergyPlus as contemplated by the Contract and that PPL EnergyPlus is thus excused from performing under the Contract, and that PPL EnegyPlus' termination of the Contract based on the DC Circuit Court's ruling is effective.

- 2 -

17618441

## THE PARTIES

9.     Plaintiff PPL EnergyPlus is a limited liability company formed under the laws of the Commonwealth of Pennsylvania, with its principal place of business in Allentown, Pennsylvania.

10.     Upon information and belief, defendant Saracen is a limited partnership formed under the laws of the State of Texas, with its principal place of business in Houston, Texas.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(1), because this case is between citizens of different States and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

12.     Venue is proper in this district because, in the Contract, Saracen: a) irrevocably submitted to the jurisdiction of this Court; b) waived any objection to the laying of venue in this district; c) waived any claim that this district is an inconvenient forum; and d) waived any objection to this Court's assertion of personal jurisdiction over it.

## STATEMENT OF FACTS

### A.    CAIR -- EPA's "Clean Air Interstate Rule"

13.     Title I of the U.S. Clean Air Act ("CAA"), 42 U.S.C. §§ 7401 *et seq.*, mandates that EPA, among other things, issue national ambient air quality standards ("NAAQS") for certain air pollutants. It further requires EPA to divide the country into areas denominated as "nonattainment," "attainment," or "unclassifiable" for each air pollutant, depending on whether the area satisfies the NAAQS.

14.     The EPA has stated that its statutory authority to effectuate CAIR is set forth in 42 U.S.C. § 7410(a)(2)(D).

17618441

15.     CAIR was intended to reduce or eliminate the effect of upwind sources on out-of-state downwind nonattainment of NAAQS for fine particulate matter ("PM"), a pollutant associated with respiratory and cardiovascular difficulties, and eight-hour ozone, a pollutant commonly known as "smog."

16.     EPA determined that NOx is a precursor to both PM and ozone formation, and CAIR required upwind states to reduce their NOx emissions.

17.     Specifically, CAIR established a NOx emission allowance for each of the 28 states (and the District of Columbia) covered by the Rule for those states to then distribute to their EGUs.

18.     Each CAIR NOx Annual Allowance permits an EGU to emit one ton of NOx in one year, and each state received a budget of Annual Allowances pursuant to a formula set forth in the Rule.

19.     CAIR's annual NOx trading program allows EGUs to transfer unused Annual Allowances to other entities.

**B.     The PPL EnergyPlus/Saracen Contract**

20.     On or about July 31, 2007, PPL EnergyPlus and Saracen entered into a "Master Agreement," using the standard form of the International Swaps and Derivatives Association ("ISDA") to govern anticipated transactions between them, including those involving the exchange of NOx Annual Allowances. The Master Agreement, including its Schedule and ISDA Credit Support Annex, is attached hereto as Exhibit A.

21.     The Master Agreement includes and incorporates the Schedule to the Master Agreement (the "Schedule"), the ISDA Credit Support Annex, the First Amendment to the ISDA Master Agreement and the documents and other confirming evidence exchanged between the

- 4 -

parties confirming those transactions (the "Confirmations"). The First Amendment to the ISDA Master Agreement is attached hereto as Exhibit B.

22.    The only two Confirmations at issue in this litigation that have been exchanged between the parties set forth trade dates of August 6, 2007 and August 7, 2007. Those Confirmations are attached hereto as Exhibits C and D, respectively. The Master Agreement, Schedule, Credit Support Annex, First Amendment to the Master Agreement and Confirmations form a single contract and are hereinafter collectively referred to as the "Contract."

23.    The Contract provides that it is to be governed by and construed in accordance with New York law, without effect to conflict of laws principles.

24.    Each Confirmation sets forth the details of the transaction to which it applies.

25.    The August 6 and August 7, 2007 Confirmations (Exhibits C and D) each provide that Saracen:

> has purchased the right, but not the obligation, to sell and deliver the Annual Allowances (as defined herein) specified below, and upon [Saracen's] exercise of such option, [Saracen] will have the obligation to sell and deliver, and [PPL EnergyPlus] will have the obligation to purchase and receive such Annual Allowances under the following terms and conditions:
>
> Strike Price: 4500.00 USD per Allowance
>
> Quantity:  500 Allowances
>
> Premium: 500.00 USD [510.00 USD for August 7, 2007 Confirmation] per Allowance payable by [Saracen] to [PPL EnergyPlus] . . . .
>
> Option Exercise:  One time exercise by verbal notice no later than the Option Expiration Date.
>
> Option Expiration Date: 1:00 pm Eastern Prevailing Time on December 15, 2008.

26.    Paragraph 3 of each Confirmation in turn defines the term "Annual Allowance" as follows:

17618441

> An Annual Allowance means the authorization from the [EPA] or
> any successor agency with similar jurisdiction, pursuant to the
> Clean Air Interstate Rule promulgated March 10, 2005, and
> adherent to the Federal Implementation Plan ("FIP") Annual NOx
> Cap and Trade Program approved by the EPA, 40 CFR Part 97, 70
> FR 25162, to emit one ton of nitrogen oxide ("NOx") in a calendar
> year, beginning 2009.

27.     In addition, Paragraph 9 of each Confirmation demonstrates the parties' intent that

if the CAIR Annual Allowance trading program is eliminated due to government action, the

Contract may be terminated by either party upon written notice to the other party.

28.     The Federal Implementation Plan ("FIP") and Clean Air Interstate Rule pursuant

to which Annual Allowances were created by the EPA and permitted to be traded by the EPA

were on July 11, 2008 found to be illegal, and thus vacated, by the U.S. Court of Appeals for the

District of Columbia Circuit in *North Carolina v. Environmental Protection Agency*, __ F.3d __,

2008 WL 2698180 (D.C. Cir. July 11, 2008).

29.     In vacating CAIR in its entirety, the DC Circuit Court rejected the suggestion that

the illegal portion of the Rule could be severed from the lawful portion.  The DC Circuit Court

made clear that its complete vacatur included CAIR's allowance trading program, stating: "The

trading program is unlawful. . . ." *Id.* at *30.  The Court also made clear that it was vacating

EPA's Federal Implementation Plan ("FIP"), stating: "we vacate the FIP as well." *Id.*

30.     The DC Circuit Court has exclusive jurisdiction to determine the legality of any

regulatory action or rule implemented pursuant to the CAA. *See* 42 U.S.C. § 7607(b)(1).

31.     In light of the DC Circuit Court's July 11, 2008 ruling, Annual Allowances in the

form contemplated by the Contract are no longer authorized and do not exist.  There are no

requirements to surrender allowances for each ton of annual emissions.  EGUs that planned to

generate allowances for sale by reducing their own emissions have no obligation to make such

reductions and thus any purported allowances would not reflect any such obligation to control emissions. Purported allowances thus cannot be transferred, traded, sold or otherwise exploited.

32.     Performance of the Contract has thus been rendered impossible, and the parties are relieved from their respective obligations under the Contract.

33.     Moreover, PPL EnergyPlus' written notice of termination of the Contract based upon governmental action terminating CAIR is effective and the Contract is terminated.

**C.     Saracen's Attempt To Deliver Annual Allowances After The DC Circuit Court's Ruling**

34.     Subsequent to the DC Circuit Court's July 11, 2008 ruling vacating the entire CAIR program, Saracen improperly attempted to force PPL EnergyPlus to purchase Annual Allowances pursuant to the Contract, notwithstanding that Annual Allowances no longer existed. On August 1, 2008, Saracen contacted PPL EnergyPlus and exercised the options under the Contract to sell 1,000 Annual Allowances at $4,500 per Annual Allowance.

35.     Pursuant to CAIR, both PPL EnergyPlus and Saracen have maintained NOx Annual Allowance accounts with the EPA.

36.     To deliver NOx Annual Allowances to PPL EnergyPlus pursuant to its exercise of the options under the Contract, Saracen must instruct EPA to transfer the appropriate number of Allowances from its NOx Annual Allowance account to PPL EnergyPlus' account through EPA's CAMD Business Systems ("CBS").

37.     On August 6, 2008, Saracen sought to deliver 500 Annual Allowances into PPL EnergyPlus' EPA account. Also on August 6, 2008, Saracen invoiced PPL EnergyPlus for 500 Annual Allowances in the amount of $2,250,000.00.

38.     Upon information and belief, in light of its exercise of a second option, Saracen intends to attempt to deliver to PPL EnergyPlus 500 additional Annual Allowances and to invoice PPL EnergyPlus for an additional $2,250,000.00 as a result.

- 7 -

17618441

39.     On August 8, 2008, in accordance with the Contract's requirements, PPL EnergyPlus notified Saracen in writing that it was terminating the Contract.

## FIRST CAUSE OF ACTION
### (Declaratory Judgment With Respect To The Contract)

40.     Plaintiffs reallege and incorporate by reference Paragraphs 1-39 as if fully set forth herein.

41.     There is an actual justiciable controversy between PPL EnergyPlus and Saracen concerning, among other things:  a) whether performance under the Contract has been rendered impossible by virtue of the DC Circuit Court's vacatur of CAIR in its entirety; b) whether the Contract is terminated; and c) whether any amounts of money are due and owing from PPL EnergyPlus to Saracen, and if so, the amount.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment:

a) On their First Cause of Action, declaring that: 1) performance under the Contract has been rendered impossible by virtue of the DC Circuit Court's vacatur of CAIR in its entirety; 2) the Contract is terminated; and 3) no monies are due and owing from PPL EnergyPlus to Saracen under the Contract; and

b) For such other and further relief as the Court deems just and proper.

17618441

Dated: August 8, 2008
     New York, New York

Respectfully submitted,

SONNENSCHEIN NATH & ROSENTHAL LLP

By: _____
     Michael S. Gugig (MG 6000)
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 768-6700
Facsimile: (212) 768-6800

Attorneys for Plaintiff
  PPL EnergyPlus, LLC

17618441

# EXHIBIT A

(Multicurrency — Cross Border)



# ISDA®

International Swap Dealers Association, Inc.

# MASTER AGREEMENT

dated as of .....July 31, 2007..............

PPL EnergyPlus, LLC ........................................... and    Saracen Merchant Energy LP ..................

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows:

**1.    Interpretation**

(a)    *Definitions*.  The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)    *Inconsistency*.  In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail.  In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purpose of the relevant Transaction.

(c)    *Single Agreement*.  All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

**2.    Obligations**

(a)    *General Conditions*.

(i)    Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)    Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency.  Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii)    Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

Copyright © 1992 by International Swap Dealers Association, Inc.

(b)      *Change of Account.* Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)      *Netting.* If on any date amounts would otherwise be payable:

    (i)      in the same currency; and

    (ii)     in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)      *Deduction or Withholding for Tax.*

    (i)      *Gross-Up.* All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:—

        (1)      promptly notify the other party ("Y") of such requirement;

        (2)      pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

        (3)      promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

        (4)      if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:

            (A)      the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

            (B)      the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

ISDA® 1992

(ii)  *Liability*. If:

(1)  X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

(2)  X does not so deduct or withhold; and

(3)  a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

(e)  *Default Interest; Other Amounts*. Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(e), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

## 3.    Representations

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement) that:—

(a)  *Basic Representations*.

(i)  *Status*. It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

(ii)  *Powers*. It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

(iii)  *No Violation or Conflict*. Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(iv)  *Consents*. All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v)  *Obligations Binding*. Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

3

ISDA® 1992

(b)    *Absence of Certain Events.* No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)    *Absence of Litigation.* There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)    *Accuracy of Specified Information.* All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)    **Payer Tax Representation.** Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)    **Payee Tax Representations.** Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

4.    **Agreements**

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)    *Furnish Specified Information.* It will deliver to the other party or, in certain cases under subparagraph (iii) below, to such government or taxing authority as the other party reasonably directs:—

(i)    any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

(ii)    any other documents specified in the Schedule or any Confirmation; and

(iii)    upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)    *Maintain Authorisations.* It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)    *Comply with Laws.* It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)    *Tax Agreement.* It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)    *Payment of Stamp Tax.* Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated,

4

organised, managed and controlled, or considered to have its seat, or in which a branch or office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction") and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

## 5.    Events of Default and Termination Events

(a)    *Events of Default.* The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party: —

(i)    *Failure to Pay or Deliver.* Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

(ii)    *Breach of Agreement.* Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

(iii)    *Credit Support Default.*

(1)    Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

(2)    the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

(3)    the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

(iv)    *Misrepresentation.* A representation (other than a representation under Section 3(e) or (f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

(v)    *Default under Specified Transaction.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(vi)    *Cross Default.* If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however

5

described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii) *Bankruptcy*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party: —

(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii) *Merger Without Assumption*. The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer:

(1) the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2) the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)    *Termination Events*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, a Tax Event if the event is specified in (ii) below or a Tax Event Upon Merger if the event is specified in (iii) below, and, if specified to be applicable, a Credit Event

6

Upon Merger if the event is specified pursuant to (iv) below or an Additional Termination Event if the event is specified pursuant to (v) below:—

   (i)   **Illegality.** Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party):—

      (1)  to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

      (2)  to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

   (ii)  **Tax Event.** Due to (x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Payment Date (1) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

   (iii)  **Tax Event Upon Merger.** The party (the "Burdened Party") on the next succeeding Scheduled Payment Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Indemnifiable Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets to, another entity (which will be the Affected Party) where such action does not constitute an event described in Section 5(a)(viii);

   (iv)  **Credit Event Upon Merger.** If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

   (v)  **Additional Termination Event.** If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c)  *Event of Default and Illegality.* If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

6.    Early Termination

(a)    *Right to Terminate Following Event of Default.* If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)    *Right to Terminate Following Termination Event.*

    (i)    *Notice.* If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

    (ii)    *Transfer to Avoid Termination Event.* If either an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, excluding immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist.

    If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

    Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed.

    (iii) *Two Affected Parties.* If an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

    (iv) *Right to Terminate.* If: —

        (1) a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

        (2) an Illegality under Section 5(b)(i)(2), a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

    either party in the case of an Illegality, the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then

ISDA© 1992

continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c)   *Effect of Designation.*

(i)    If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii)    Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d)   *Calculations.*

(i)    **Statement.** On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii)    *Payment Date.* An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment) in the Termination Currency, from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e)   *Payments on Early Termination.* If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method" or the "Second Method". If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method", as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i)    *Events of Default.* If the Early Termination Date results from an Event of Default: —

(1) *First Method and Market Quotation.* If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party over (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party.

(2) *First Method and Loss.* If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3) *Second Method and Market Quotation.* If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the

ISDA® 1992

Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4) *Second Method and Loss*. If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii)   *Termination Events*. If the Early Termination Date results from a Termination Event: —

(1) *One Affected Party*. If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2) *Two Affected Parties*. If there are two Affected Parties: —

(A) if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalent of the Unpaid Amounts owing to Y; and

(B) if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii)   *Adjustment for Bankruptcy*. In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv)   *Pre-Estimate*. The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

ISDA© 1992

### 7.    Transfer

Subject to Section 6(b)(ii), neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that: —

(a)    a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)    a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

### 8.    Contractual Currency

(a)    **Payment in the Contractual Currency.** Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency"). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in a reasonable manner and in good faith in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b)    **Judgments.** To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purposes of such judgment or order and the rate of exchange at which such party is able, acting in a reasonable manner and in good faith in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party. The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

(c)    **Separate Indemnities.** To the extent permitted by applicable law, these indemnities constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d)    **Evidence of Loss.** For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

**9.    Miscellaneous**

(a)    *Entire Agreement*. This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

(b)    *Amendments*. No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c)    *Survival of Obligations*. Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)    *Remedies Cumulative*. Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)    *Counterparts and Confirmations*.

(i) This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

(ii) The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f)    *No Waiver of Rights*. A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)    *Headings*. The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

**10.    Offices; Multibranch Parties**

(a)    If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to the other party that, notwithstanding the place of booking office or jurisdiction of incorporation or organisation of such party, the obligations of such party are the same as if it had entered into the Transaction through its head or home office. This representation will be deemed to be repeated by such party on each date on which a Transaction is entered into.

(b)    Neither party may change the Office through which it makes and receives payments or deliveries for the purpose of a Transaction without the prior written consent of the other party.

(c)    If a party is specified as a Multibranch Party in the Schedule, such Multibranch Party may make and receive payments or deliveries under any Transaction through any Office listed in the Schedule, and the Office through which it makes and receives payments or deliveries with respect to a Transaction will be specified in the relevant Confirmation.

**11.    Expenses**

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document

ISDA® 1992

to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

**12.    Notices**

(a)    *Effectiveness*. Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:

(i)    if in writing and delivered in person or by courier, on the date it is delivered;

(ii)    if sent by telex, on the date the recipient's answerback is received;

(iii)    if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

(iv)    if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

(v)    if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)    *Change of Addresses*. Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

**13.    Governing Law and Jurisdiction**

(a)    *Governing Law*. This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)    *Jurisdiction*. With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:—

(i)    submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

(ii)    waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)    *Service of Process*. Each party irrevocably appoints the Process Agent (if any) specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings. If for any

ISDA® 1992

reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12. Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by law.

(d)    *Waiver of Immunities.* Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

## 14.    Definitions

As used in this Agreement:—

"*Additional Termination Event*" has the meaning specified in Section 5(b).

"*Affected Party*" has the meaning specified in Section 5(b).

"*Affected Transactions*" means (a) with respect to any Termination Event consisting of an Illegality, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

"*Affiliate*" means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

"*Applicable Rate*" means:—

(a)    in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b)    in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c)    in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d)    in all other cases, the Termination Rate.

"*Burdened Party*" has the meaning specified in Section 5(b).

"*Change in Tax Law*" means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs on or after the date on which the relevant Transaction is entered into.

"*consent*" includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

"*Credit Event Upon Merger*" has the meaning specified in Section 5(b).

"*Credit Support Document*" means any agreement or instrument that is specified as such in this Agreement.

"*Credit Support Provider*" has the meaning specified in the Schedule.

"*Default Rate*" means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

ISDA® 1992

*"Defaulting Party"* has the meaning specified in Section 6(a).

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iv).

*"Event of Default"* has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

*"Illegality"* has the meaning specified in Section 5(b).

*"Indemnifiable Tax"* means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

*"law"* includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority) and *"lawful"* and *"unlawful"* will be construed accordingly.

*"Local Business Day"* means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

*"Loss"* means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 11. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

*"Market Quotation"* means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have

been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

*"Non-default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

*"Non-defaulting Party"* has the meaning specified in Section 6(a).

*"Office"* means a branch or office of a party, which may be such party's head or home office.

*"Potential Event of Default"* means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

*"Reference Market-makers"* means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

*"Relevant Jurisdiction"* means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

*"Scheduled Payment Date"* means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

*"Set-off"* means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

*"Settlement Amount"* means, with respect to a party and any Early Termination Date, the sum of: —

(a)   the Termination Currency Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b)   such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

*"Specified Entity"* has the meanings specified in the Schedule.

16

ISDA® 1992

*"Specified Indebtedness"* means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

*"Specified Transaction"* means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

*"Stamp Tax"* means any stamp, registration, documentation or similar tax.

*"Tax"* means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

*"Tax Event"* has the meaning specified in Section 5(b).

*"Tax Event Upon Merger"* has the meaning specified in Section 5(b).

*"Terminated Transactions"* means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

*"Termination Currency"* has the meaning specified in the Schedule.

*"Termination Currency Equivalent"* means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Market Quotation or Loss (as the case may be), is determined as of a later date, that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties.

*"Termination Event"* means an Illegality, a Tax Event or a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

*"Termination Rate"* means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

*"Unpaid Amounts"* owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

PPL EnergyPlus, LLC

By: ...........................................
Name:  Clarence J. Hopf, Jr.
Title:  President
Date:  8/15/07

Saracen Merchant Energy LP

By: ...........................................
Name:  Amanda M. Seabay
Title:  Vice President
Date:  8-10-07

ISDA® 1992

Execution Version

**SCHEDULE**
**to the**
**1992 ISDA Master Agreement**
**(Multi-Currency- Cross Border)**

**dated as of July 31, 2007**

**PPL EnergyPlus, LLC**
**a Pennsylvania limited liability company**
**("Party A")**
**and**

**Saracen Merchant Energy LP**
**a limited partnership**
**("Party B")**

**Part 1**
**Termination Provisions**

(a)    **"Specified Entity"** means in relation to Party A, none; and in relation to Party B, none.

(b)    **"Specified Transaction"** has the meaning specified in Section 14 of this Agreement save that Section 14 shall be hereby amended in line 8 after the words "currency option" by adding a comma and the words "agreement for the purchase, sale or transfer of any commodity or any other commodity trading transaction.". For this purpose, "commodity" means any tangible or intangible commodity of any type or description (including, without limitation, electric energy and/or capacity, emission allowances, petroleum, natural gas and fuel oil, and the products or bi-products thereof).

(c)    The **"Cross Default"** provisions of Section 5(a)(vi) will apply to Party A and to Party B. The second line of Section 5 (a)(vi) is amended by deleting the comma between the words "default and event" and replacing with the word "or" and deleting the words, "or other such similar condition or event (however described)". The seventh line of Section 5(a)(vi) is amended by deleting the phrase ", or becoming capable at such time of being declared,".

**"Specified Indebtedness"** has the meaning specified in Section 14.

**"Threshold Amount"** means with respect to Party A or Party A's Credit Support Provider, $50,000,000; and with respect to Party B, $50,000,000.

(d)    The **"Credit Event Upon Merger"** provision of Section 5(b)(iv) will apply to Party A and Party B.

(e)    The **"Automatic Early Termination"** provision of Section 6(a) will not apply to Party A and will not apply to Party B.

(f)    **Payments on Early Termination.** For the purpose of Section 6(e) of this Agreement:
   (i)    Loss will apply.
   (ii)    The Second Method will apply.

19

Execution Version

(g)    **"Termination Currency"** means United States Dollars.

(h)    **Additional Termination Event.**  Not applicable

**Part 2**
**Tax Representations**

(a)    **Payer Representations.**  For the purpose of Section 3(e) of this Agreement each of Party A and Party B make the following representations:

It is not required by an applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction to withholding for or on account of any Tax from any payment (other than interest under Sections 2(e), 6(d)(ii), or 6(e) of this Agreement) to be made by it to the other party under this Agreement.  In making this representation, it may rely on:

(i)    the accuracy of any representation made by the other party pursuant to Section 3(f) of this Agreement;

(ii)   the satisfaction of the agreement contained in Section 4(a)(i) or 4(a)(iii) and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii) of this Agreement; and

(iii)  the satisfaction of the agreement of the other party contained in Section 4(d) of this Agreement, provided that it shall not be a breach of this representation where reliance is placed on clause (ii) and the other party does not deliver a form or document under Section 4(a)(iii) by reason of material prejudice to its legal or commercial position.

(b)    **Payee Representations.**  For the purpose of Section 3(f) of this Agreement, Party A and Party B make the following representations specified below:

The following representation will apply in relation to Party A:

Party A is a limited liability company created or organized under the laws of the Commonwealth of Pennsylvania.  Party A is a U.S. person within the meaning of Section 7701 of the Internal Revenue Code and its U.S. taxpayer identification number is 23-2974252.

The following representation will apply in relation to Party B:

Party B is a limited partnership created or organized in the Cayman Islands and its registration number issued by the Registrar of Limited Partnerships is 15396.  It is a "foreign person" (as that term is used in Section 1.6041(a)(4) of United States Treasury Regulation) for United States federal income tax purposes.

Execution Version

**Part 3**
**Agreement to Deliver Documents**

For the purpose of Sections 4(a)(i) and (ii) of this Agreement, each party agrees to deliver the following documents, as applicable:

(a)     **Tax forms, documents or certificates to be delivered are:**

Each party agrees to deliver any document required or reasonably requested to allow the other party to make payments under the Agreement without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (i) before the first Payment Date under this Agreement, (ii) promptly upon reasonable demand by the other party, and (iii) promptly upon learning that any such form previously provided has become obsolete or incorrect.

(b)     **Other documents to be delivered are:**

| Party Required to Deliver | Form/Document/ Certificate | Date by Which to be Delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| Party A and Party B | Certified copies of resolutions of authorized body, which may be generic and not specific, authorizing execution, delivery, and performance of this Agreement | At execution of this Master Agreement | Yes |
| Party A and | Annual Report of Credit Support Provider containing consolidated financial statements for the relevant year certified by independent certified public accountants | As soon as available and in any event within 120 days after the end of each fiscal year of the delivering party or with respect to Party A, on www.shareholder.com/ppl/edgar.cfm | Yes |
| Party B | Annual Report of Party B containing consolidated financial statements for the relevant year certified by independent certified public accountants | As soon as available and in any event within 120 days after the end of each fiscal year | Yes |
| Party A and Party B | Duly executed Credit Support Document specified in Part 4(g) | At execution of this Master Agreement | Yes |
| Party A and Party B | Evidence of authority of signatories substantially in the form attached as Exhibit A or a form reasonably agreeable to the other party | At execution of this Master Agreement | Yes |

Execution Version

## Part 4
## Miscellaneous

(a)  **Address for Notices.** For the purpose of Section 12(a) of this Agreement

   Address for notices or communications (other than Confirmations or payments) to Party A:
   
   PPL EnergyPlus, LLC
   Two North Ninth Street
   Allentown, PA 18101-1179
   Attention: Contract Administration (GENPL7)
   Facsimile No:   (610) 774-5077
   Telephone:      (610) 774-4716

   With a copy to:
   
   PPL Services Corporation
   Two North Ninth Street
   Allentown, PA 18101-1179
   Attention: Office of General Counsel (GENTW3)
   Facsimile No:   (610) 774-6908
   Telephone:      (610) 774-6726

   Address for Confirmations to Party A:
   
   PPL Services Corporation
   Two North Ninth Street
   Allentown, PA 18101-1179
   Attention: Trading Controls (GENPL7)
   Facsimile No:   (610) 774-7413
   Telephone:      (610) 774-7412

   Address for notices or communications to Party B:
   
   Saracen Merchant Energy LP
   Address:       Five Greenway Plaza
                  Suite 1310
                  Houston, TX 77046
   Attention:     Legal Department
   Telephone:     713-285-2900
       Facsimile:     713-285-2911
       E-mail: saracenlegal@saracenenergy.com
       Credit  credit@saracenenergy.com
       Settlements  settlements@saracenenergy.com
       Confirmations  confirms@saracenenergy.com

(b)  **Process Agent.** For the purpose of Section 13(c) of this Agreement:
   Party A appoints as its Process Agent:  None
   Party B appoints as its Process Agent:  None

Execution Version

**(c)**    **Accounts.** If a Confirmation does not state the account to which United States Dollar payments are to be made, then the parties shall send notice of account information, and any payment shall be made by either Automated Clearing House ("ACH") or wire transfer.

**(d)**    **Offices.** The provisions of Section 10(a) of this Agreement will apply to this Agreement.

**(e)**    **Multibranch Party.** For the purpose of Section 10(c) of this Agreement:   Party A is not a Multibranch Party, and Party B is not a Multibranch Party.

**(f)**    **Calculation Agent.** The Calculation Agent as defined in the Commodity Definitions is Party A, unless otherwise specified in a Confirmation in relation to the relevant Transaction, provided that, if an Event of Default has occurred and is continuing with respect to Party A, then Party B shall be the Calculation Agent. The Calculation Agent shall make all determinations and calculations in a commercially reasonable manner in accordance with standard market practice. In the event a party disputes a calculation or determination made by the Calculation Agent, the parties shall first endeavor to resolve such dispute. If the parties are unable to resolve such dispute within a commercially reasonable time, the parties shall mutually select a dealer in the applicable commodity to act as Calculation Agent with respect to the issue in dispute.

**(g)**    **Credit Support Documents.**

>    **(i)**    With respect to Party A and Party B, the Credit Support Annex attached hereto, which constitutes a Credit Support Document, is incorporated by reference in, and made part of, the Agreement and each Confirmation (unless provided otherwise in a Confirmation) as if set forth in full in the Agreement or such Confirmation.

>    **(ii)**    With respect to Party A, a Guaranty, in the form and substance acceptable to Party B, executed by PPL Energy Supply, LLC.

>    **(iii)**    With respect to Party B, Not Applicable.

**(h)**    **Credit Support Provider.** Credit Support Provider means in relation to Party A: PPL Energy Supply, LLC, and Credit Support Provider means in relation to Party B: Not Applicable

**(i)**    **Netting of Payments.** The limitation set forth in Section 2(c)(ii) will not apply to Transactions thus allowing the netting of Transactions.

**(j)**    **GOVERNING LAW. THIS AGREEMENT WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO PRINCIPLES OF CONFLICT OF LAWS.**

**Part 5**
**Other Provisions**

**(a)**    **Confirmations and Procedures for Entering into Transactions.** On or promptly following the date on which the parties reach agreement on the terms of a Transaction, Party A shall send a Confirmation to Party B. Party B will promptly thereafter confirm the accuracy of (in the manner required by Section 9(e)(ii)), or request the correction of, such Confirmation (in the latter case,

indicating how it believes the terms of such Confirmation should be correctly stated and such other terms which should be added to or deleted from such Confirmation to make it correct). If any dispute shall arise as to whether an error exists in a Confirmation, the parties shall in good faith make reasonable efforts to resolve the dispute. If Party B has not accepted or disputed the Confirmation in the manner set forth above within five (5) Local Business Days after it was sent to Party B, the Confirmation shall be deemed binding as sent absent manifest error. If Party A fails to send a Confirmation within three (3) General Business Days after the Transaction is entered into, Party B may, but shall not be required to, send a Confirmation to Party A.

(b) **Absence of Litigation.** Section 3(c) is hereby amended by:

   (i)     with respect to each party, limiting the definition of "Affiliates" in the second line thereof for purposes of this representation to its Credit Support Provider; and

   (ii)    adding in the second line thereof after the word "governmental" the words "or regulatory".

(c) **Accuracy of Specified Information.** Section 3(d) is hereby amended by adding in the third line thereof after the word "respect" and before the period the words "or, in the case of audited or unaudited financial statements, a fair presentation of the financial condition of the relevant party based upon generally accepted accounting principles, subject to any noted qualifications, consistently applied."

(d) **Section 3 Representations.** Section 3 is hereby amended by adding at the end thereof the following Subparagraphs (g), (h), (i) and (j):

   (g)     **Line of Business.** It has entered into this Agreement (including each Transaction evidenced hereby) in conjunction with its line of business (including financial intermediation services) or the financing of its business.

   (h)     **Eligible Contract Participant.** It constitutes an "eligible contract participant" as such term is defined in Section 1a(12) of the Commodity Exchange Act (7 U.S.C. 1a), as amended by the Commodity Futures Modernization Act of 2000.

   (i)     **Option Exemption Applicable.** With respect to any Transaction that is an option, as defined by the Commodities Futures Trading Commission ("CFTC"), it is an entity to whom such option may be offered under the CFTC option exemption, as modified and currently set forth in Rule 32.4 of the CFTC, 17 C.F.R. § 32.4.

   (j)     **Standardization, Creditworthiness, and Transferability.** The economic terms of the Agreement, any Credit Support Document to which it is a party, and each Transaction have been individually tailored and negotiated by it; it has received and reviewed financial information concerning the other party and has had a reasonable opportunity to ask questions of and receive answers and information from the other party concerning such other party, this Agreement, such Credit Support Document, and such Transaction; the creditworthiness of the other party was a material consideration in its entering into or determining the terms of this Agreement, such Credit Support document, and such Transaction; and the transferability of this Agreement, such Credit Support Document, and such Transaction is restricted as provided herein and therein.

Execution Version

(e)  **Setoff.** Without affecting or prejudicing the provisions of this Agreement requiring the calculation and payment of certain net payment amounts on Scheduled Payment Dates, all payments will be made without setoff or counterclaim; *provided however*, that upon the designation or deemed designation of an Early Termination Date, in addition to and not in limitation of any other right or remedy (including any right to setoff, counterclaim, or otherwise withhold payment) under applicable law, the Non-Defaulting Party and its Affiliates or the Non-Affected Party and its Affliates (in whichever case, "X") may, at its option and in its discretion, setoff, against any amounts owed to the Defaulting Party or Affected Party (in either case "Y"), any amounts owed by Y to X [X now includes Affilates.]as of the Early Termination Date. The obligations of Y and X under this Agreement in respect of such amounts shall be deemed satisfied and discharged to the extent of any such setoff. If an obligation is unascertained, X may, in good faith, estimate that obligation and setoff in respect of the estimate, subject to X or Y, as the case may be, accounting to the other party when the obligation is ascertained. X will give Y notice of any setoff effected under this section, provided that failure to give such notice shall not affect the validity of the setoff.

(f)  **Credit Support Default.** Subparagraph (3) of Section 5(a)(iii) is hereby amended by adding in the second line thereof after the word "Document" the words "(or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf)".

(g)  **Interest Rate Limitation.** Notwithstanding any provision to the contrary contained in this Agreement, in no event shall the Default Rate, Non-default Rate, or Termination Rate exceed the Highest Lawful Rate. For purposes hereof, "Highest Lawful Rate" shall mean, the lesser of two percent (2%) above the prime rate of Citibank, N.A., or its successor or assign, or the maximum rate of interest allowed under applicable law.

(h)  **LIMITATION OF LIABILITY. NO PARTY SHALL BE REQUIRED TO PAY OR BE LIABLE FOR INCIDENTAL, CONSEQUENTIAL, OR INDIRECT DAMAGES (WHETHER OR NOT ARISING FROM ITS NEGLIGENCE) TO ANY OTHER PARTY EXCEPT TO THE EXTENT THAT THE PAYMENTS REQUIRED TO BE MADE PURSUANT TO THIS AGREEMENT ARE DEEMED TO BE SUCH DAMAGES; PROVIDED, HOWEVER, THAT NOTHING IN THIS PROVISION SHALL AFFECT THE ENFORCEABILITY OF SECTION 6(e) OF THIS AGREEMENT. IF AND TO THE EXTENT ANY PAYMENT REQUIRED TO BE MADE PURSUANT TO THIS AGREEMENT IS DEEMED TO CONSTITUTE LIQUIDATED DAMAGES, THE PARTIES ACKNOWLEDGE AND AGREE THAT SUCH DAMAGES ARE DIFFICULT OR IMPOSSIBLE TO DETERMINE AND THAT SUCH PAYMENT IS INTENDED TO BE A REASONABLE APPROXIMATION OF THE AMOUNT OF SUCH DAMAGES AND NOT A PENALTY.**

(i)  **Confidentiality.** The existence of this Agreement, its contents, and the existence and contents of all other instruments and documents relating to this Agreement (including but not limited to any Credit Support Documents and any Confirmations), and any information made available by one party or its Credit Support Provider to the other party or its Credit Support Provider (if any) with respect to the Agreement or any Transaction hereunder is confidential and shall not be discussed with or disclosed to any third party (nor shall any public announcement or press release regarding the subject matter hereof be made by either party, except with the prior written consent of the other party hereto). Notwithstanding the foregoing, either party may disclose confidential information hereunder (i) to any of that party's Affiliates, or its auditors, attorneys, advisors, prospective purchasers with which the party has a written agreement, or financial institutions with which the

Execution Version

party has a written agreement or which are otherwise required to keep the information that is disclosed in confidence or (ii) as may be required or appropriate in response to any summons, subpoena, or otherwise in connection with any litigation or to comply with any applicable law, order, regulation, or ruling, or accounting disclosure rule or standard (provided that in such case, the party that is proposing to make such disclosure will notify the other party prior to such disclosure and cooperate with the other party, if requested, in attempting to obtain a protective order against such disclosure). Any disclosure of confidential information pursuant to the immediately preceding sentence will not affect or change the confidential nature of such information and such information will continue to be subject to the restrictions set forth in this paragraph. Information that either party receives or obtains hereunder shall not be considered confidential information to the extent such information (a) is or becomes generally available to the public or is generally known within the parties' industries, or (b) is obtained from a third party who, to such party's knowledge, did not violate its obligations to the other party or its Credit Support Provider (if any) if making such disclosure, or (c) is independently developed by such party without reference to the other party's confidential information.

(j)     **Relationship Between Parties.** The parties agree to add the following Section 15 to the Master Agreement:

**15.    Relationship Between Parties.** Each party will be deemed to represent to the other party on the date on which it enters into a Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for that Transaction):

(a)    **Non-Reliance.** It is acting for its own account, and has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of a Transaction shall not be considered investment advice or a recommendation to enter into that Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected result of the Transaction.

(b)    **Assessment and Understanding.** It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of that Transaction. It is also capable of assuming, and assumes, the risks of that Transaction.

(c)    **Status of Parties.** The other party is not acting as a fiduciary for or an adviser to it in respect of the Transaction

(k)     **Prior Transactions.** Upon the effectiveness of this Agreement, unless otherwise agreed to in writing by the parties to this Agreement, all transactions of the type covered by this Agreement, then outstanding between the parties ("Prior Transactions") shall be subject to the terms hereof. To the extent of any conflict between the terms and provisions of the Prior Transactions and the terms and provisions of this Agreement, the terms and provisions of this Agreement shall control; provided that, all Performance Assurance, as held by a party pursuant to the terms of and as defined in the Prior Transactions, shall automatically become Posted Credit Support under this Agreement, in each case subject to the terms of this Agreement "Performance Assurance" means

Execution Version

collateral in the form of either cash, Letter(s) of Credit, or other security acceptable to the Requesting Party.

(l)    **Fully-paid Transactions.** Notwithstanding the terms of Section 5 and 6 of this Agreement, if at any time and so long as one of the parties to this Agreement ("X") shall have satisfied in full its payment and delivery obligations under Section 2(a)(i) of this Agreement and shall at the time have no future payment or delivery obligations, whether absolute or contingent, under such Section 2(a)(i), then unless the other party ("Y") is required pursuant to appropriate proceedings to return to X or otherwise returns to X upon demand of X any portion of any such payment or delivery, the occurrence of an event described in Section 5(a) of this Agreement with respect to X, any Credit Support Provider of X or any Specified Entity of X shall not constitute an Event of Default or a Potential Event of Default with respect to X as the Defaulting Party; provided, however, notwithstanding the foregoing sentence, Y shall be entitled to designate an Early Termination Date pursuant to Section 6 of this Agreement only as a result of the occurrence of (i) an Event of Default set forth in Section 5(a)(v) of this Agreement with respect to X as the Defaulting Party or (ii) a Termination Event set forth in (A) either Section 5(b)(i) or 5(b)(ii) of this Agreement with respect to Y as the Affected Party or (B) Section 5(b)(iii) of this Agreement with respect to Y as the Burdened Party.

(m)    **Severability.** If any term, provision, covenant or condition of this Agreement, or the application thereof to any party or circumstance, shall be held to be invalid or unenforceable (in whole or in part) for any reason, the remaining terms, provisions, covenants, and conditions hereof shall continue in full force and effect as if this Agreement had been executed with the invalid or unenforceable portion eliminated, so long as this Agreement as so modified continues to express, without material change, the original intentions of the parties as to the subject matter of this Agreement and the deletion of such portion of this Agreement will not substantially impair the respective benefits or expectations of the parties to this Agreement.

(n)    **Telephonic Recording.** Each party consents to the creation of a tape or electronic recording ("Recording") of all telephone conversations between the parties to this Agreement, and agrees that any such Recordings will be retained in confidence, secured from improper access, and nothing in this Agreement will restrict either party from offering such recording as evidence in any proceeding or action relating to this Agreement. Each party waives any further notice of such monitoring or recording, and agrees to notify its officers and employees of such monitoring or recording and to obtain any necessary consent of such officers and employees. The Recording, and the terms and conditions described therein, if admissible, shall be the controlling evidence for the parties' agreement with respect to a particular Transaction in the event a Confirmation is not fully executed (or deemed accepted) by both parties. Upon full execution (or deemed acceptance) of a Confirmation, such Confirmation shall control in the event of any conflict with the terms of a Recording.

(o)    **Definitions.**

(i) This Agreement, each Confirmation, and each Transaction are subject to the 2000 ISDA Definitions and the 2005 ISDA Commodity Definitions, as such definitions may be amended, supplemented. replaced or modified from time to time (collectively, the "Definitions"), each as published by the International Swaps and Derivatives Association, Inc. ("ISDA"), and will be governed in all respects by the Definitions (except that any references to "Swap Transactions" in the Definitions will be deemed to be references to "Transactions"). The Definitions are

Execution Version

incorporated by reference in, and made part of, this Agreement and each relevant Confirmation as if set forth in full in this Agreement and such Confirmation. In the event of any inconsistency between the provisions of this Agreement and the Definitions, this Agreement will prevail.

(ii) The definition "Potential Event of Default" in Section 14 is deleted in its entirety and replaced with "Intentionally Left Blank."

(p)   The phrase "Potential Event of Default" is deleted from the following Sections of this Agreement: 2(a)(iii) and 3(b).

IN WITNESS WHEREOF, the parties have executed this document as of the date specified on the first page hereof.

PPL ENERGYPLUS, LLC

By: _____

Name:   Clarence J. Hopf, Jr.

Title:   President

SARACEN MERCHANT ENERGY LP

By: _____

Name:   Amanda M Seaberg

Title:   Vice President



28

Execution Version

## EXHIBIT A

## INCUMBENCY AND SIGNATURE CERTIFICATE

The undersigned, the [Assistant] Secretary of _____ (the "Counterparty"), a corporation [LLC, LP, GP, etc.] organized under the laws of the State of _____, hereby certifies that:

1.    The ISDA Master Agreement dated as of _____, 200__, including the Schedule, Confirmation, and other exhibits, supplements, attachments and annexes thereto and documents incorporated by reference therein (collectively the "Agreement Documentation"), between PPL EnergyPlus, LLC and the Counterparty have been duly executed and delivered for, in the name of, and on behalf of the Counterparty by the following officer, whose title and signature appear below:


**NAME**                    **TITLE**                    **SIGNATURE**



2.    The foregoing officer who, on behalf of the Counterparty, executed and delivered the Agreement Documentation was at the date thereof and is now duly authorized as a signatory of the Counterparty and the signature of such person appearing on the Agreement Documentation is his/her genuine signature.

**IN WITNESS WHEREOF**, the undersigned has executed this certificate the ___day of _____ , _____.



**[NAME OF COUNTERPARTY]**


**By:**_____
**Name:** _____
**Title:** [Assistant] Secretary

(Bilateral Form)                                  (ISDA Agreements Subject to New York Law Only)



International Swaps and Derivatives Association, Inc.

# CREDIT SUPPORT ANNEX

to the Schedule to the

## ISDA MASTER AGREEMENT

dated as of    July 31, 2007

between

PPL EnergyPlus, LLC,                    and          Saracen Merchant Energy LP

       ("Party A")                                                      ("Party B")

This Annex supplements, forms part of, and is subject to, the above-referenced Agreement, is part of its Schedule and is a Credit Support Document under this Agreement with respect to each party.

Accordingly, the parties agree as follows:—

**Paragraph 1. Interpretation**

(a)  *Definitions and Inconsistency.*  Capitalized terms not otherwise defined herein or elsewhere in this Agreement have the meanings specified pursuant to Paragraph 12, and all references in this Annex to Paragraphs are to Paragraphs of this Annex. In the event of any inconsistency between this Annex and the other provisions of this Schedule, this Annex will prevail, and in the event of any inconsistency between Paragraph 13 and the other provisions of this Annex, Paragraph 13 will prevail.

(b)  *Secured Party and Pledgor.*  All references in this Annex to the "Secured Party" will be to either party when acting in that capacity and all corresponding references to the "Pledgor" will be to the other party when acting in that capacity; *provided, however*, that if Other Posted Support is held by a party to this Annex, all references herein to that party as the Secured Party with respect to that Other Posted Support will be to that party as the beneficiary thereof and will not subject that support or that party as the beneficiary thereof to provisions of law generally relating to security interests and secured parties.

**Paragraph 2. Security Interest**

Each party, as the Pledgor, hereby pledges to the other party, as the Secured Party, as security for its Obligations, and grants to the Secured Party a first priority continuing security interest in, lien on and right of Set-off against all Posted Collateral Transferred to or received by the Secured Party hereunder. Upon the Transfer by the Secured Party to the Pledgor of Posted Collateral, the security interest and lien granted hereunder on that Posted Collateral will be released immediately and, to the extent possible, without any further action by either party.

Copyright © 1994 by International Swaps and Derivatives Association, Inc.

**Paragraph 3. Credit Support Obligations**

(a)    *Delivery Amount.*  Subject to Paragraphs 4 and 5, upon a demand made by the Secured Party on or promptly following a Valuation Date, if the Delivery Amount for that Valuation Date equals or exceeds the Pledgor's Minimum Transfer Amount, then the Pledgor will Transfer to the Secured Party Eligible Credit Support having a Value as of the date of Transfer at least equal to the applicable Delivery Amount (rounded pursuant to Paragraph 13). Unless otherwise specified in Paragraph 13, the *"Delivery Amount"* applicable to the Pledgor for any Valuation Date will equal the amount by which:

(i) the Credit Support Amount

exceeds

(ii) the Value as of that Valuation Date of all Posted Credit Support held by the Secured Party.

(b)    *Return Amount.*  Subject to Paragraphs 4 and 5, upon a demand made by the Pledgor on or promptly following a Valuation Date, if the Return Amount for that Valuation Date equals or exceeds the Secured Party's Minimum Transfer Amount, then the Secured Party will Transfer to the Pledgor Posted Credit Support specified by the Pledgor in that demand having a Value as of the date of Transfer as close as practicable to the applicable Return Amount (rounded pursuant to Paragraph 13). Unless otherwise specified in Paragraph 13, the *"Return Amount"* applicable to the Secured Party for any Valuation Date will equal the amount by which:

(i) the Value as of that Valuation Date of all Posted Credit Support held by the Secured Party

exceeds

(ii) the Credit Support Amount.

*"Credit Support Amount"*  means, unless otherwise specified in Paragraph 13, for any Valuation Date (i) the Secured Party's Exposure for that Valuation Date plus (ii) the aggregate of all Independent Amounts applicable to the Pledgor, if any, minus (iii) all Independent Amounts applicable to the Secured Party, if any, minus (iv) the Pledgor's Threshold; *provided, however,* that the Credit Support Amount will be deemed to be zero whenever the calculation of Credit Support Amount yields a number less than zero.

**Paragraph 4. Conditions Precedent, Transfer Timing, Calculations and Substitutions**

(a)    *Conditions Precedent.*  Each Transfer obligation of the Pledgor under Paragraphs 3 and 5 and of the Secured Party under Paragraphs 3, 4(d)(ii), 5 and 6(d) is subject to the conditions precedent that:

(i) no Event of Default, Potential Event of Default or Specified Condition has occurred and is continuing with respect to the other party; and

(ii) no Early Termination Date for which any unsatisfied payment obligations exist has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the other party.

(b)    *Transfer Timing.*  Subject to Paragraphs 4(a) and 5 and unless otherwise specified, if a demand for the Transfer of Eligible Credit Support or Posted Credit Support is made by the Notification Time, then the relevant Transfer will be made not later than the close of business on the next Local Business Day; if a demand is made after the Notification Time, then the relevant Transfer will be made not later than the close of business on the second Local Business Day thereafter.

(c)    *Calculations.*  All calculations of Value and Exposure for purposes of Paragraphs 3 and 6(d) will be made by the Valuation Agent as of the Valuation Time. The Valuation Agent will notify each party (or the other party, if the Valuation Agent is a party) of its calculations not later than the Notification Time on the Local Business Day following the applicable Valuation Date (or in the case of Paragraph 6(d), following the date of calculation).

ISDA®1994

(d)   *Substitutions.*

(i) Unless otherwise specified in Paragraph 13, upon notice to the Secured Party specifying the items of Posted Credit Support to be exchanged, the Pledgor may, on any Local Business Day, Transfer to the Secured Party substitute Eligible Credit Support (the "Substitute Credit Support"); and

(ii) subject to Paragraph 4(a), the Secured Party will Transfer to the Pledgor the items of Posted Credit Support specified by the Pledgor in its notice not later than the Local Business Day following the date on which the Secured Party receives the Substitute Credit Support, unless otherwise specified in Paragraph 13 (the "Substitution Date"); *provided* that the Secured Party will only be obligated to Transfer Posted Credit Support with a Value as of the date of Transfer of that Posted Credit Support equal to the Value as of that date of the Substitute Credit Support.

**Paragraph 5. Dispute Resolution**

If a party (a "Disputing Party") disputes (I) the Valuation Agent's calculation of a Delivery Amount or a Return Amount or (II) the Value of any Transfer of Eligible Credit Support or Posted Credit Support, then (1) the Disputing Party will notify the other party and the Valuation Agent (if the Valuation Agent is not the other party) not later than the close of business on the Local Business Day following (X) the date that the demand is made under Paragraph 3 in the case of (I) above or (Y) the date of Transfer in the case of (II) above, (2) subject to Paragraph 4(a), the appropriate party will Transfer the undisputed amount to the other party not later than the close of business on the Local Business Day following (X) the date that the demand is made under Paragraph 3 in the case of (I) above or (Y) the date of Transfer in the case of (II) above, (3) the parties will consult with each other in an attempt to resolve the dispute and (4) if they fail to resolve the dispute by the Resolution Time, then:

(i) In the case of a dispute involving a Delivery Amount or Return Amount, unless otherwise specified in Paragraph 13, the Valuation Agent will recalculate the Exposure and the Value as of the Recalculation Date by:

(A) utilizing any calculations of Exposure for the Transactions (or Swap Transactions) that the parties have agreed are not in dispute;

(B) calculating the Exposure for the Transactions (or Swap Transactions) in dispute by seeking four actual quotations at mid-market from Reference Market-makers for purposes of calculating Market Quotation, and taking the arithmetic average of those obtained; *provided* that if four quotations are not available for a particular Transaction (or Swap Transaction), then fewer than four quotations may be used for that Transaction (or Swap Transaction); and if no quotations are available for a particular Transaction (or Swap Transaction), then the Valuation Agent's original calculations will be used for that Transaction (or Swap Transaction); and

(C) utilizing the procedures specified in Paragraph 13 for calculating the Value, if disputed, of Posted Credit Support.

(ii) In the case of a dispute involving the Value of any Transfer of Eligible Credit Support or Posted Credit Support, the Valuation Agent will recalculate the Value as of the date of Transfer pursuant to Paragraph 13.

Following a recalculation pursuant to this Paragraph, the Valuation Agent will notify each party (or the other party, if the Valuation Agent is a party) not later than the Notification Time on the Local Business Day following the Resolution Time. The appropriate party will, upon demand following that notice by the Valuation Agent or a resolution pursuant to (3) above and subject to Paragraphs 4(a) and 4(b), make the appropriate Transfer.

**Paragraph 6. Holding and Using Posted Collateral**

(a)    *Care of Posted Collateral.* Without limiting the Secured Party's rights under Paragraph 6(c), the Secured Party will exercise reasonable care to assure the safe custody of all Posted Collateral to the extent required by applicable law, and in any event the Secured Party will be deemed to have exercised reasonable care if it exercises at least the same degree of care as it would exercise with respect to its own property. Except as specified in the preceding sentence, the Secured Party will have no duty with respect to Posted Collateral, including, without limitation, any duty to collect any Distributions, or enforce or preserve any rights pertaining thereto.

(b)    *Eligibility to Hold Posted Collateral; Custodians.*

(i) *General.* Subject to the satisfaction of any conditions specified in Paragraph 13 for holding Posted Collateral, the Secured Party will be entitled to hold Posted Collateral or to appoint an agent (a "Custodian") to hold Posted Collateral for the Secured Party. Upon notice by the Secured Party to the Pledgor of the appointment of a Custodian, the Pledgor's obligations to make any Transfer will be discharged by making the Transfer to that Custodian. The holding of Posted Collateral by a Custodian will be deemed to be the holding of that Posted Collateral by the Secured Party for which the Custodian is acting.

(ii) *Failure to Satisfy Conditions.* If the Secured Party or its Custodian fails to satisfy any conditions for holding Posted Collateral, then upon a demand made by the Pledgor, the Secured Party will, not later than five Local Business Days after the demand, Transfer or cause its Custodian to Transfer all Posted Collateral held by it to a Custodian that satisfies those conditions or to the Secured Party if it satisfies those conditions.

(iii) *Liability.* The Secured Party will be liable for the acts or omissions of its Custodian to the same extent that the Secured Party would be liable hereunder for its own acts or omissions.

(c)    *Use of Posted Collateral.* Unless otherwise specified in Paragraph 13 and without limiting the rights and obligations of the parties under Paragraphs 3, 4(d)(ii), 5, 6(d) and 8, if the Secured Party is not a Defaulting Party or an Affected Party with respect to a Specified Condition and no Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Secured Party, then the Secured Party will, notwithstanding Section 9-207 of the New York Uniform Commercial Code, have the right to:

(i) sell, pledge, rehypothecate, assign, invest, use, commingle or otherwise dispose of, or otherwise use in its business any Posted Collateral it holds, free from any claim or right of any nature whatsoever of the Pledgor, including any equity or right of redemption by the Pledgor; and

(ii) register any Posted Collateral in the name of the Secured Party, its Custodian or a nominee for either.

For purposes of the obligation to Transfer Eligible Credit Support or Posted Credit Support pursuant to Paragraphs 3 and 5 and any rights or remedies authorized under this Agreement, the Secured Party will be deemed to continue to hold all Posted Collateral and to receive Distributions made thereon, regardless of whether the Secured Party has exercised any rights with respect to any Posted Collateral pursuant to (i) or (ii) above.

(d)    *Distributions and Interest Amount.*

(i) *Distributions.* Subject to Paragraph 4(a), if the Secured Party receives or is deemed to receive Distributions on a Local Business Day, it will Transfer to the Pledgor not later than the following Local Business Day any Distributions it receives or is deemed to receive to the extent that a Delivery Amount would not be created or increased by that Transfer, as calculated by the Valuation Agent (and the date of calculation will be deemed to be a Valuation Date for this purpose).

ISDA®1994

(ii) *Interest Amount.* Unless otherwise specified in Paragraph 13 and subject to Paragraph 4(a), in lieu of any interest, dividends or other amounts paid or deemed to have been paid with respect to Posted Collateral in the form of Cash (all of which may be retained by the Secured Party), the Secured Party will Transfer to the Pledgor at the times specified in Paragraph 13 the Interest Amount to the extent that a Delivery Amount would not be created or increased by that Transfer, as calculated by the Valuation Agent (and the date of calculation will be deemed to be a Valuation Date for this purpose). The Interest Amount or portion thereof not Transferred pursuant to this Paragraph will constitute Posted Collateral in the form of Cash and will be subject to the security interest granted under Paragraph 2.

**Paragraph 7. Events of Default**

For purposes of Section 5(a)(iii)(1) of this Agreement, an Event of Default will exist with respect to a party if:

(i) that party fails (or fails to cause its Custodian) to make, when due, any Transfer of Eligible Collateral, Posted Collateral or the Interest Amount, as applicable, required to be made by it and that failure continues for two Local Business Days after notice of that failure is given to that party;

(ii) that party fails to comply with any restriction or prohibition specified in this Annex with respect to any of the rights specified in Paragraph 6(c) and that failure continues for five Local Business Days after notice of that failure is given to that party; or

(iii) that party fails to comply with or perform any agreement or obligation other than those specified in Paragraphs 7(i) and 7(ii) and that failure continues for 30 days after notice of that failure is given to that party.

**Paragraph 8. Certain Rights and Remedies**

(a)    *Secured Party's Rights and Remedies.* If at any time (1) an Event of Default or Specified Condition with respect to the Pledgor has occurred and is continuing or (2) an Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Pledgor, then, unless the Pledgor has paid in full all of its Obligations that are then due, the Secured Party may exercise one or more of the following rights and remedies:

(i) all rights and remedies available to a secured party under applicable law with respect to Posted Collateral held by the Secured Party;

(ii) any other rights and remedies available to the Secured Party under the terms of Other Posted Support, if any;

(iii) the right to Set-off any amounts payable by the Pledgor with respect to any Obligations against any Posted Collateral or the Cash equivalent of any Posted Collateral held by the Secured Party (or any obligation of the Secured Party to Transfer that Posted Collateral); and

(iv) the right to liquidate any Posted Collateral held by the Secured Party through one or more public or private sales or other dispositions with such notice, if any, as may be required under applicable law, free from any claim or right of any nature whatsoever of the Pledgor, including any equity or right of redemption by the Pledgor (with the Secured Party having the right to purchase any or all of the Posted Collateral to be sold) and to apply the proceeds (or the Cash equivalent thereof) from the liquidation of the Posted Collateral to any amounts payable by the Pledgor with respect to any Obligations in that order as the Secured Party may elect.

Each party acknowledges and agrees that Posted Collateral in the form of securities may decline speedily in value and is of a type customarily sold on a recognized market, and, accordingly, the Pledgor is not entitled to prior notice of any sale of that Posted Collateral by the Secured Party, except any notice that is required under applicable law and cannot be waived.

ISDA®1994

(b)    *Pledgor's Rights and Remedies.* If at any time an Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Secured Party, then (except in the case of an Early Termination Date relating to less than all Transactions (or Swap Transactions) where the Secured Party has paid in full all of its obligations that are then due under Section 6(e) of this Agreement):

(i)    the Pledgor may exercise all rights and remedies available to a pledgor under applicable law with respect to Posted Collateral held by the Secured Party;

(ii)    the Pledgor may exercise any other rights and remedies available to the Pledgor under the terms of Other Posted Support, if any;

(iii)    the Secured Party will be obligated immediately to Transfer all Posted Collateral and the Interest Amount to the Pledgor; and

(iv)    to the extent that Posted Collateral or the Interest Amount is not so Transferred pursuant to (iii) above, the Pledgor may:

(A)    Set-off any amounts payable by the Pledgor with respect to any Obligations against any Posted Collateral or the Cash equivalent of any Posted Collateral held by the Secured Party (or any obligation of the Secured Party to Transfer that Posted Collateral); and

(B)    to the extent that the Pledgor does not Set-off under (iv)(A) above, withhold payment of any remaining amounts payable by the Pledgor with respect to any Obligations, up to the Value of any remaining Posted Collateral held by the Secured Party, until that Posted Collateral is Transferred to the Pledgor.

(c)    *Deficiencies and Excess Proceeds.* The Secured Party will Transfer to the Pledgor any proceeds and Posted Credit Support remaining after liquidation, Set-off and/or application under Paragraphs 8(a) and 8(b) after satisfaction in full of all amounts payable by the Pledgor with respect to any Obligations; the Pledgor in all events will remain liable for any amounts remaining unpaid after any liquidation, Set-off and/or application under Paragraphs 8(a) and 8(b).

(d)    *Final Returns.* When no amounts are or thereafter may become payable by the Pledgor with respect to any Obligations (except for any potential liability under Section 2(d) of this Agreement), the Secured Party will Transfer to the Pledgor all Posted Credit Support and the Interest Amount, if any.

## Paragraph 9. Representations

Each party represents to the other party (which representations will be deemed to be repeated as of each date on which it, as the Pledgor, Transfers Eligible Collateral) that:

(i)    it has the power to grant a security interest in and lien on any Eligible Collateral it Transfers as the Pledgor and has taken all necessary actions to authorize the granting of that security interest and lien;

(ii)    it is the sole owner of or otherwise has the right to Transfer all Eligible Collateral it Transfers to the Secured Party hereunder, free and clear of any security interest, lien, encumbrance or other restrictions other than the security interest and lien granted under Paragraph 2;

(iii)    upon the Transfer of any Eligible Collateral to the Secured Party under the terms of this Annex, the Secured Party will have a valid and perfected first priority security interest therein (assuming that any central clearing corporation or any third-party financial intermediary or other entity not within the control of the Pledgor involved in the Transfer of that Eligible Collateral gives the notices and takes the action required of it under applicable law for perfection of that interest); and

(iv)    the performance by it of its obligations under this Annex will not result in the creation of any security interest, lien or other encumbrance on any Posted Collateral other than the security interest and lien granted under Paragraph 2.

6

**Paragraph 10. Expenses**

(a)     *General.* Except as otherwise provided in Paragraphs 10(b) and 10(c), each party will pay its own costs and expenses in connection with performing its obligations under this Annex and neither party will be liable for any costs and expenses incurred by the other party in connection herewith.

(b)     *Posted Credit Support.* The Pledgor will promptly pay when due all taxes, assessments or charges of any nature that are imposed with respect to Posted Credit Support held by the Secured Party upon becoming aware of the same, regardless of whether any portion of that Posted Credit Support is subsequently disposed of under Paragraph 6(c), except for those taxes, assessments and charges that result from the exercise of the Secured Party's rights under Paragraph 6(c).

(c)     *Liquidation/Application of Posted Credit Support.* All reasonable costs and expenses incurred by or on behalf of the Secured Party or the Pledgor in connection with the liquidation and/or application of any Posted Credit Support under Paragraph 8 will be payable, on demand and pursuant to the Expenses Section of this Agreement, by the Defaulting Party or, if there is no Defaulting Party, equally by the parties.

**Paragraph 11. Miscellaneous**

(a)     *Default Interest.* A Secured Party that fails to make, when due, any Transfer of Posted Collateral or the Interest Amount will be obligated to pay the Pledgor (to the extent permitted under applicable law) an amount equal to interest at the Default Rate multiplied by the Value of the items of property that were required to be Transferred, from (and including) the date that Posted Collateral or Interest Amount was required to be Transferred to (but excluding) the date of Transfer of that Posted Collateral or Interest Amount. This interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(b)     *Further Assurances.* Promptly following a demand made by a party, the other party will execute, deliver, file and record any financing statement, specific assignment or other document and take any other action that may be necessary or desirable and reasonably requested by that party to create, preserve, perfect or validate any security interest or lien granted under Paragraph 2, to enable that party to exercise or enforce its rights under this Annex with respect to Posted Credit Support or an Interest Amount or to effect or document a release of a security interest on Posted Collateral or an Interest Amount.

(c)     *Further Protection.* The Pledgor will promptly give notice to the Secured Party of, and defend against, any suit, action, proceeding or lien that involves Posted Credit Support Transferred by the Pledgor or that could adversely affect the security interest and lien granted by it under Paragraph 2, unless that suit, action, proceeding or lien results from the exercise of the Secured Party's rights under Paragraph 6(c).

(d)     *Good Faith and Commercially Reasonable Manner.* Performance of all obligations under this Annex, including, but not limited to, all calculations, valuations and determinations made by either party, will be made in good faith and in a commercially reasonable manner.

(e)     *Demands and Notices.* All demands and notices made by a party under this Annex will be made as specified in the Notices Section of this Agreement, except as otherwise provided in Paragraph 13.

(f)     *Specifications of Certain Matters.* Anything referred to in this Annex as being specified in Paragraph 13 also may be specified in one or more Confirmations or other documents and this Annex will be construed accordingly.

**Paragraph 12. Definitions**

As used in this Annex:—

*"Cash"* means the lawful currency of the United States of America.

*"Credit Support Amount"* has the meaning specified in Paragraph 3.

*"Custodian"* has the meaning specified in Paragraphs 6(b)(i) and 13.

*"Delivery Amount"* has the meaning specified in Paragraph 3(a).

*"Disputing Party"* has the meaning specified in Paragraph 5.

*"Distributions"* means with respect to Posted Collateral other than Cash, all principal, interest and other payments and distributions of cash or other property with respect thereto, regardless of whether the Secured Party has disposed of that Posted Collateral under Paragraph 6(c). Distributions will not include any item of property acquired by the Secured Party upon any disposition or liquidation of Posted Collateral or, with respect to any Posted Collateral in the form of Cash, any distributions on that collateral, unless otherwise specified herein.

*"Eligible Collateral"* means, with respect to a party, the items, if any, specified as such for that party in Paragraph 13.

*"Eligible Credit Support"* means Eligible Collateral and Other Eligible Support.

*"Exposure"* means for any Valuation Date or other date for which Exposure is calculated and subject to Paragraph 5 in the case of a dispute, the amount, if any, that would be payable to a party that is the Secured Party by the other party (expressed as a positive number) or by a party that is the Secured Party to the other party (expressed as a negative number) pursuant to Section 6(e)(ii)(2)(A) of this Agreement as if all Transactions (or Swap Transactions) were being terminated as of the relevant Valuation Time; *provided* that Market Quotation will be determined by the Valuation Agent using its estimates at mid-market of the amounts that would be paid for Replacement Transactions (as that term is defined in the definition of "Market Quotation").

*"Independent Amount"* means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

*"Interest Amount"* means, with respect to an Interest Period, the aggregate sum of the amounts of interest calculated for each day in that Interest Period on the principal amount of Posted Collateral in the form of Cash held by the Secured Party on that day, determined by the Secured Party for each such day as follows:

      (x) the amount of that Cash on that day; multiplied by

      (y) the Interest Rate in effect for that day; divided by

      (z) 360.

*"Interest Period"* means the period from (and including) the last Local Business Day on which an Interest Amount was Transferred (or, if no Interest Amount has yet been Transferred, the Local Business Day on which Posted Collateral in the form of Cash was Transferred to or received by the Secured Party) to (but excluding) the Local Business Day on which the current Interest Amount is to be Transferred.

*"Interest Rate"* means the rate specified in Paragraph 13.

*"Local Business Day"*, unless otherwise specified in Paragraph 13, has the meaning specified in the Definitions Section of this Agreement, except that references to a payment in clause (b) thereof will be deemed to include a Transfer under this Annex.

*"Minimum Transfer Amount"* means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

*"Notification Time"* has the meaning specified in Paragraph 13.

*"Obligations"* means, with respect to a party, all present and future obligations of that party under this Agreement and any additional obligations specified for that party in Paragraph 13.

*"Other Eligible Support"* means, with respect to a party, the items, if any, specified as such for that party in Paragraph 13.

*"Other Posted Support"* means all Other Eligible Support Transferred to the Secured Party that remains in effect for the benefit of that Secured Party.

*"Pledgor"* means either party, when that party (i) receives a demand for or is required to Transfer Eligible Credit Support under Paragraph 3(a) or (ii) has Transferred Eligible Credit Support under Paragraph 3(a).

*"Posted Collateral"* means all Eligible Collateral, other property, Distributions, and all proceeds thereof that have been Transferred to or received by the Secured Party under this Annex and not Transferred to the Pledgor pursuant to Paragraph 3(b), 4(d)(ii) or 6(d)(i) or released by the Secured Party under Paragraph 8. Any Interest Amount or portion thereof not Transferred pursuant to Paragraph 6(d)(ii) will constitute Posted Collateral in the form of Cash.

*"Posted Credit Support"* means Posted Collateral and Other Posted Support.

*"Recalculation Date"* means the Valuation Date that gives rise to the dispute under Paragraph 5; *provided, however*, that if a subsequent Valuation Date occurs under Paragraph 3 prior to the resolution of the dispute, then the "Recalculation Date" means the most recent Valuation Date under Paragraph 3.

*"Resolution Time"* has the meaning specified in Paragraph 13.

*"Return Amount"* has the meaning specified in Paragraph 3(b).

*"Secured Party"* means either party, when that party (i) makes a demand for or is entitled to receive Eligible Credit Support under Paragraph 3(a) or (ii) holds or is deemed to hold Posted Credit Support.

*"Specified Condition"* means, with respect to a party, any event specified as such for that party in Paragraph 13.

*"Substitute Credit Support"* has the meaning specified in Paragraph 4(d)(i).

*"Substitution Date"* has the meaning specified in Paragraph 4(d)(ii).

*"Threshold"* means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

*"Transfer"* means, with respect to any Eligible Credit Support, Posted Credit Support or Interest Amount, and in accordance with the instructions of the Secured Party, Pledgor or Custodian, as applicable:

    (i) in the case of Cash, payment or delivery by wire transfer into one or more bank accounts specified by the recipient;

    (ii) in the case of certificated securities that cannot be paid or delivered by book-entry, payment or delivery in appropriate physical form to the recipient or its account accompanied by any duly executed instruments of transfer, assignments in blank, transfer tax stamps and any other documents necessary to constitute a legally valid transfer to the recipient;

    (iii) in the case of securities that can be paid or delivered by book-entry, the giving of written instructions to the relevant depository institution or other entity specified by the recipient, together with a written copy thereof to the recipient, sufficient if complied with to result in a legally effective transfer of the relevant interest to the recipient; and

    (iv) in the case of Other Eligible Support or Other Posted Support, as specified in Paragraph 13.

ISDA®1994

*"Valuation Agent"* has the meaning specified in Paragraph 13.

*"Valuation Date"* means each date specified in or otherwise determined pursuant to Paragraph 13.

*"Valuation Percentage"* means, for any item of Eligible Collateral, the percentage specified in Paragraph 13.

*"Valuation Time"* has the meaning specified in Paragraph 13.

*"Value"* means for any Valuation Date or other date for which Value is calculated and subject to Paragraph 5 in the case of a dispute, with respect to:

    (i) Eligible Collateral or Posted Collateral that is:

        (A) Cash, the amount thereof; and

        (B) a security, the bid price obtained by the Valuation Agent multiplied by the applicable Valuation Percentage, if any;

    (ii) Posted Collateral that consists of items that are not specified as Eligible Collateral, zero; and

    (iii) Other Eligible Support and Other Posted Support, as specified in Paragraph 13.

ISDA®1994

# EXHIBIT B

**FIRST AMENDMENT**
**TO THE**
**ISDA MASTER AGREEMENT**
**BETWEEN**
**PPL ENERGYPLUS, LLC**
**AND**
**SARACEN MERCHANT ENERGY LP**

This Amendment dated as of August 10, 2007 ("Amendment") is made and entered into by and between PPL EnergyPlus, LLC ("Party A") and Saracen Merchant Energy LP ("Party B").

WHEREAS, Party A and Party B entered into that certain ISDA Master Agreement dated as of July 31, 2007 (the "Agreement"); and

WHEREAS, the parties hereto desire to amend the Agreement as provided herein.

NOW THEREFORE, for and in consideration of the agreements herein made and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## AMENDMENTS

The Agreement is hereby amended as follows:

**I.    Power Annex.**  The Agreement is hereby amended to add the following Part 7 of the Schedule:

(a)    **Incorporation of ISDA Power Annex.**  The North American ISDA Power Annex to the ISDA Master Agreement published by ISDA and the Edison Electric Institute on August 7, 2003 and attached hereto as Appendix 1, as amended, supplemented, replaced or modified from time to time, (the "ISDA Power Annex") is incorporated into this Agreement as a new Part 7 to the Agreement with the elections and modifications set forth below.

(b)    **Elective Provisions**

      1.    (a)(i) _X_  Applicability of Part 7 to Outstanding Power Transactions.  If not checked, not applicable.

      2.    (a)(ii) _X_  Applicability of Outstanding Credit Support held by a party in connection with Outstanding Power Transactions.  If not checked, not applicable.

      3.    c)_ X _Accelerated Payment Damages.  If not checked, not applicable.

      4.    (d)(ii): Timeliness of Payment

          __ Option A

          X_ Option B

          If neither is checked, Option B shall be deemed to apply.

1

5.    (h)(i):  Wholesale Power Tariffs

      X  Party A Electric Tariff.  Market Based Rate Tariff, Rate Schedule FERC No. 1, Dated: 12/17/1998    Docket Number: ER98-4608-000

      X  Party B Electric Tariff.

6.    (h)(ii) X Applicability of Severability provision.  If not checked, not applicable.

7.    (h)(iii) X Applicability of FERC Standard of Review and Certain Covenants and Waivers.  If not checked, not applicable.

8.    **Additional Modifications to the Terms Regarding Power Transactions.**

   •  **Definitions.**

      In Part 7(i)(iv), "Replacement Price" is amended to (i) add the phrase "for delivery" immediately before the phrase "at the Delivery Point" in the second line and (ii) delete the phrase "at Buyer's option" from the fifth line and replace it with the following:  "absent a purchase".

      In Part 7(i)(iv), "Sales Price" is amended to (i) delete the phrase "at the Delivery Point" from the second line and (ii) delete the phrase "at Seller's option" from the fifth line and replace it with the following:  "absent a sale".

   •  **Events of Default.**  Clause (i)(ii)(B) of the Power Annex is amended to delete the words "Section [5(a)(ii)][5(a)(ii)(1)]" and replace them with the words "Section 5(a)(ii)".

   •  **FERC Standard of Review.**  The following is hereby added as a new subsection (E) to the provisions of Part 7(h)(iii) of this Schedule:

      "(E)  The Parties agree that in the event that any portion of this Part 7(h)(iii) is determined to be invalid, illegal or unenforceable for any reason, the provisions of Part 7(h)(iii)(A) shall be unaffected and unimpaired thereby, and shall remain in full force and effect, to the fullest extent permitted by applicable law."

   •  **Schedule P Definitions.**  The following definitions are hereby added to Schedule P:

      (i)    "CAISO Energy" means with respect to a Power Transaction, a Product under which the Seller shall sell and the Buyer shall purchase a quantity of energy equal to the hourly quantity without Ancillary Services (as defined in the Tariff) that is or will be scheduled as a schedule coordinator to schedule coordinator transaction pursuant to the applicable tariff and protocol provisions of the California Independent System Operator ("CAISO") (as amended from time to time, the "Tariff") for which the only excuse for failure to deliver or receive is an "Uncontrollable Force" (as defined in the Tariff).

      (ii)    "WSPPA-Economy" means with respect to a Transaction, a Product defined by the WSPP Agreement in Service Schedule A as Economy Energy Service.

      (iii) "WSPPB-Unit Commitment" means with respect to a Transaction, a Product defined by the WSPP Agreement in Service Schedule B as Unit Commitment Service.  Unless

2

otherwise agreed between the parties, Paragraph B-3.8 of Service Schedule B shall not apply. This Product will be prescheduled according to WECC guidelines for a specified unit and will be subject to all special conditions agreed to between the parties.

(iv) "WSPPC-Firm" or "West Firm" means with respect to a Transaction, a Product defined by the WSPP Agreement in Service Schedule C as Firm Capacity/Energy Sale or Exchange Service, which product specifically includes operating reserves as such are required within a WECC-certified Control Area. For purposes of WECC Transactions executed through the Intercontinental Exchange ("ICE") service, "Electricity Firm-LD" shall mean "WSPPC-Firm".

(v) "WECC" means the Western Electricity Coordinating Council.

(vi) "WSPP Agreement" means the Western Systems Power Pool Agreement as amended from time to time.

- **Schedule P Additional Provision.** The following provision is hereby added to Schedule P:

"If the Parties agree to a service level/product defined by reference to a different agreement (e.g., the WSPP Agreement and the ERCOT Agreement) for a particular Power Transaction, then, unless the Parties expressly state and agree that all the terms and conditions of such other agreement will apply, such reference to a service level/product shall be as defined by such other agreement, including if applicable, the regional reliability requirements and guidelines as well as the specific excuses for performance, Force Majeure, Uncontrollable Forces, or other such excuses applicable to such other agreement, to the extent inconsistent with the terms of this Agreement, but all other terms and conditions of this Agreement remain applicable."

- **Notices for Power Transactions**

Party A:  PPL EnergyPlus, LLC

All Notices:

**(East)** Two North Ninth Street
Allentown, PA    Zip: 18101-1179
Attn: Contract Administration (GENPL7)
Phone: 610-774-4716   Facsimile: 610-774-5077

**(West)** 45 Basin Creek Rd.
Butte, MT    Zip: 59701
Attn: Contract Administration
Phone: 406-533-3528   Facsimile: 406-533-0208

Duns: 047414524
Federal Tax ID Number: 23-2974252

Party B:  Saracen Merchant Energy LP

All Notices:

Street:  Five Greenway Plaza, Suite 1310

Houston, Texas 77046

Attn:  Contract Administration
Phone: 713-366-7016
Facsimile: 713-285-2911

Duns: 185932311
Federal Tax ID Number: 20-2220945

3

**Invoices:**
(**East**): Attn: Bulk Power Billing (GENPL8)
Phone: 610-774-6310    Facsimile: 610-774-4511
(**West**): Attn: Accounting
Phone: 406-533-3502    Facsimile: 406-533-0208

**Scheduling:**
(**East**): Attn: Power Scheduling (GENPL7)
Phone: 610-774-6314    Facsimile: 610-774-6523
(**West**): Attn: Preschedule
Phone: 406-533-3570    Facsimile: 406-533-0208

**Confirmations:**
(**East**): Attn: Trading Controls (GENPL7)
Phone: 610-774-2813    Facsimile: 610-774-7413
(**West**): Attn: Trading Controls
Phone: 406-533-3512    Facsimile: 406-533-0208

**Payments:**
(**East**): Attn: Bulk Power Billing (GENPL8)
Phone: 610-774-6310    Facsimile: 610-774-4511
(**West**): Attn: Accounting
Phone: 406-533-3502    Facsimile: 406-533-0208

**Wire Transfer:**
BNK: Mellon Bank, N.A., Pittsburgh, PA 15259
ABA: 031000037
ACCT: 2-964-823

**Credit and Collections:**
Attn: Credit (GENPL7)
Phone: 610-774-6129
Facsimile: 610-774-5561

**With additional Notices of an Event of Default or Potential Event of Default to:**

1. Attn: Credit Risk Manager (GENTW14)
   Phone: 610-774-6053
   Facsimile: 610-774-5235

2. Attn: Office of General Counsel (GENTW3)
   Phone: 610-774-6908
   Facsimile: 610-774-6726

**Invoices:**
Attn: settlements@saracenenergy.com
Phone:
Facsimile: 832-565-1649

**Scheduling:**
Attn: Scheduling
Phone: 713-366-7035
Facsimile: 713-285-2911

**Confirmations**
Attn: confirms@saracenenergy.com
Phone:
Facsimile: 713-513-5403

**Payments:**
Attn: settlements@saracenenergy.com
Phone:
Facsimile: 832-565-1649

**Wire Transfer:**
BNK: JP Morgan Chase Bank, N.A.
ABA: 021000021
ACCT: 707552741

**Credit and Collections:**
Attn: credit@saracenenergy.com
Phone:
Facsimile: 713-583-9262

**With additional Notices of an Event of Default or Potential Event of Default to:**

Attn: 1
Phone:
Facsimile:

---

**II.    Gas Annex** The Agreement is hereby amended to add the following Part 8 of the Schedule

(a)    **Incorporation of ISDA Gas Annex.** The ISDA North American Gas Annex to the ISDA Master Agreement published by ISDA on November 23, 2004, and attached hereto as Appendix 2, as amended,

supplemented, replaced or modified from time to time, (the "ISDA Gas Annex") is incorporated into this Agreement as a new Part 8 to the Agreement with the elections and modifications set forth below.

(l)      **Elective Provisions**

    **1.  (a)(ii) – Outstanding Gas Transactions.** This Gas Annex shall apply to the following pre-existing Gas Transactions pursuant to clause (a)(ii):

    _X_ Option A:  All Gas Transactions outstanding between the parties as of the date this Gas Annex becomes effective.

    ___ Option B:  The Gas Transactions listed in Schedule 1 to this Gas Annex.

    ___ Option C:  None of the Gas Transactions between the parties that were executed prior to the date this Gas Annex becomes effective.

If none of the above options is selected, Option A shall apply.

    **2.  (a)(iii) – Outstanding Gas Credit Support**.

    _X_  Outstanding Gas Credit Support held by a party in connection with Outstanding Gas Transactions shall be deemed to have been delivered under and in connection with this Agreement pursuant to clause (a)(iii).  If not checked, not applicable.

    **3.  (b)(ii) – Performance Obligation** (remedy for breach of Firm obligation)

    _X_ Option A:  Cover Standard

    ___ Option B:  Spot Price Standard

If neither option is selected, Option A shall apply.

    **4.  (e) – Taxes**

    _X_   Option A: Buyer Pays At and After Delivery Point

    ___   Option B: Seller Pays Before and At Deliver Point

If neither option is selected, Option A shall apply.

    **5.  (f)(ii) – Payment Date**

    _X_ Option A: the later of the 25th Day of Month following Month of delivery or 10 Days after receipt of the invoice by Buyer (provided that if the Payment Date is not a Local Business Day, payment is due on the next Local Business Day following that date).

_____ Option B: the later of the _____ Day of Month following Month of delivery or 10 Days after receipt of the invoice by Buyer (provided that if the Payment Date is not a Local Business Day, payment is due on the next Local Business Day following that date).

_____ Option C: Notwithstanding anything to the contrary in the Schedule, payments with respect to both Gas Transactions and Gas Transactions (as defined separately in the Schedule) will be netted and payable on or before the later of the 20th Day of Month following Month of delivery or 10 Days after receipt of the invoice by Buyer (provided that if the Payment Date is not a Local Business Day, payment is due on the next Local Business Day following that date).

_____ Option D: Notwithstanding anything to the contrary in the Schedule, payments with respect to both Gas Transactions and Gas Transactions (as defined separately in the Schedule) will be netted and payable on or before the later of the 25th Day of Month following Month of delivery or 10 Days after receipt of the invoice by Buyer (provided that if the Payment Date is not a Local Business Day, payment is due on the next Local Business Day following that date).

If none of the above options is selected, Option A shall apply.

6.  **(k)(xxii) – Alternative to Spot Price Index.** The parties have selected the following alternative index as the Spot Price Index: _____. If no index is specified, the Spot Price Index specified in clause (l)(xxi) applies.

(m)    **Notices for Gas Transactions**

| **PARTY A – PPL EnergyPlus, LLC** | **PARTY B** – Saracen Merchant Energy, LP |
|---|---|
| **Invoices:** | **Invoices:** |
| As set forth in Part 4 of the Schedule unless otherwise set forth below: | As set forth in Part 4 of the Schedule unless otherwise set forth below: |
| Attn: Gas Settlement | Attn: settlements@saracenenergy.com |
| Phone:    610-774-6179 | Phone: |
| Facsimile: 610-774-4511 | Facsimile: 832-565-1649 |
| **Nominations:** | **Nominations:** |
| As set forth in Part 4 of the Schedule unless otherwise set forth below: | As set forth in Part 4 of the Schedule unless otherwise set forth below: |
| Attn:       Gas Transportation/Operations | Attn:       Scheduling |
| Phone:    610-774-4042 | Phone:    713-366-7035 |

6

**Confirmations:**
As set forth in Part 4 of the Schedule unless
otherwise set forth below:
Attn:    Trading Controls

Phone:   610-774-7929

Facsimile: 610-774-7413

**Option Exercise:**
As set forth in Part 4 of the Schedule unless
otherwise set forth below:
Attn:    Gas Supply Trading

Phone:   610-774-7340

Facsimile: 610-774-5561

□**Wire Transfer - or - x  ACH (check one box):**
Bank:    Mellon Bank, N.A. Pittsburgh, PA
ABA:     031000037
Account: 2-964-823
Other Details: _____

**Confirmations:**
As set forth in Part 4 of the Schedule unless
otherwise set forth below:
Attn:      confirms@saracenenergy.com

Phone:

Facsimile: 713-513-5403

**Option Exercise:**
As set forth in Part 4 of the Schedule unless
otherwise set forth below:
Attn:

Phone:

Facsimile:

x□**Wire Transfer - or - □ACH (check one box):**
Bank:
ABA:
Account:
Other Details: _____

(n)    **Other Provisions/Modifications to this Gas Annex.**

- Notwithstanding anything in clause (h) of this Gas Annex to the contrary, the Force Majeure event as claimed by a party must have actually prevented or restricted that party from performing the subject obligations under the Contract and the particular affected transactions at the applicable Delivery Point(s). Seller and Buyer will make reasonable efforts to avoid the adverse impacts of a Force Majeure, and to resolve the event or occurrence once it has occurred in order to resume performance. Without limiting the generality of the foregoing, if the Force Majeure event partially interrupts or curtails one party from performing its delivery or receipt obligations under a transaction at a given Delivery Point, then the obligations of such party will be reduced only in direct proportion to the effect that the Force Majeure event has had on the ability of the restrained party to meet all of its firm delivery or receipt obligations at such Delivery Point."

- Mobile-Sierra. Each party irrevocably waives its rights, including its rights under §§ 4-5 of the Natural Gas Act, unilaterally to seek or support a change in the rate(s), charges, classifications, terms or conditions of any Gas Transaction hereunder or any other agreements entered into in connection with Gas Transactions under this Agreement. By this provision, each party expressly waives its right to seek or support: (i) an order from the U.S. Federal Energy Regulatory Commission finding that the market-based rate(s), charges, classifications, terms or conditions agreed to by the parties under this Agreement with respect to Gas Transactions are unjust and unreasonable; or (ii) any refund with respect thereto. Each party agrees not to make or support such a filing or request, and that these covenants and waivers shall be binding notwithstanding any regulatory or market changes that may occur hereafter. Absent the

agreement of all parties to the proposed change, the standard of review for changes to any provision of this Agreement (including all Gas Transactions and/or Confirmations) specifying the rate(s) or other material economic terms and conditions agreed to by the parties herein, whether proposed by a party, a non-party or FERC acting *sua sponte*, shall be the "public interest" standard of review set forth in <u>United Gas Pipe Line Co. v. Mobile Gas Service Corp.</u>, 350 U.S. 332 (1956) and <u>Federal Power Commission v. Sierra Pacific Power Co.</u>, 350 U.S. 348 (1956)(the "Mobile-Sierra" doctrine).

**III.    Bankruptcy Matters.** With respect to all Power and Gas Transactions

(i)    Each party acknowledges and agrees that (i) certain Transaction(s) constitute "forward contracts" within the meaning of title 11 of the United States Code (the "Bankruptcy Code"); (ii) certain Transactions constitute "swap agreements" within the meaning of the Bankruptcy Code; (iii) each of Party A and Party B is a "forward contract merchant" within the meaning of the Bankruptcy Code with respect to any Transactions that constitute "forward contracts"; (iv) each of Party A and Party B is a "swap participant" within the meaning of the Bankruptcy Code with respect to any Transactions that constitute "swap agreements"; (v) all payments made or to be made by one party to the other party pursuant to this Agreement constitute "settlement payments" within the meaning of the Bankruptcy Code; (vi) all transfers of Eligible Credit Support by one party to the other party under this Agreement constitute "margin payments" within the meaning of the Bankruptcy Code; and (vii) each party's rights under Section 6 "Early Termination" of this Agreement constitutes a "contractual right to liquidate" the Transactions within the meaning of the Bankruptcy Code.

(ii)    Each party acknowledges and agrees that, for purposes of this Agreement, the other party is not a "utility" as such term is used in Section 366 of the Bankruptcy Code, and each party agrees to waive and not to assert the applicability of the provisions of Section 366 in any bankruptcy proceeding wherein such party is a debtor. In any such proceeding, each party further agrees to waive the right to assert that the other party is a provider of last resort.

**IV.    Disputes and Adjustments of Invoices.** With respect to all Power and Gas Transactions, a party may, in good faith, dispute the correctness of any invoice or any adjustment to an invoice, rendered under this Agreement or adjust any invoice for any arithmetic or computational error within twelve (12) months of the date the invoice, or adjustment to an invoice, was rendered. In the event an invoice or portion thereof, or any other claim or adjustment arising hereunder, is disputed, payment of the undisputed portion of the invoice shall be required to be made when due, with notice of the objection given to the other party. Any invoice dispute or invoice adjustment shall be in writing and shall state the basis for the dispute or adjustment. Payment of the disputed amount shall not be required until the dispute is resolved. Upon resolution of the dispute, any required payment shall be made within two (2) Business Days of such resolution along with interest accrued at the Interest Rate from and including the due date to but excluding the date paid. Inadvertent overpayments shall be returned upon request or deducted by the party receiving such overpayment from subsequent payments, with interest accrued at the Interest Rate from and including the date of such overpayment to but excluding the date repaid or deducted by the party receiving such overpayment. Any dispute with respect to an invoice is waived unless the other party is notified in accordance with this Agreement within twelve (12) months after the invoice is rendered or any specific adjustment to the invoice is made. If an invoice is not rendered within twelve (12) months after the close of the month during which performance of a Power or Gas Transaction occurred, the right to payment for such performance is waived.

Except as specifically modified herein, all other terms and conditions of the Agreement shall remain in full force and effect.

IN WITNESS WHEREOF, the parties have executed this document as of the date specified on the first page hereof.

**PPL Energy Plus, LLC**

By: _____

Name: __Clarence J. Hopf, Jr.__

Title: __President__

**Saracen Merchant Energy LP**

By: _____

Name: _____

Title: _____





9

$$\boxed{\text{APPENDIX 1}}$$

**Part [6].    Physically Settled Power Transactions**

(a)    **Power Transactions under this Agreement; Credit Support Documents**

(i)    *Power Transactions.*   The provisions of this Part [6] shall apply solely to transactions between the parties for the purchase or sale of a Product (as defined below) on a spot or forward basis or as an option to purchase, sell or transfer a Product (collectively, "Power Transactions"). All Power Transactions will be deemed to have been entered into in accordance with the terms of this Agreement and shall be Transactions for the purposes hereof. A subsequent agreement between the parties to settle a Power Transaction without involving a physical delivery of a Product shall not affect such Power Transaction's status as a Power Transaction under this Part [6]. In the event of any inconsistency among or between the other provisions of this Agreement and this Part [6], this Part [6] will govern with respect to Power Transactions.

(ii)    *Applicability to Outstanding Power Transactions.*   If elected under clause (j) as being applicable: upon the effectiveness of this Part [6], all Power Transactions then outstanding ("Outstanding Power Transactions") shall be Transactions for purposes of this Agreement and shall be governed by and subject to the terms and conditions of, this Agreement. All confirmations evidencing such Outstanding Power Transactions shall constitute "Confirmations" within the meaning of this Agreement that supplement, form part of and are subject to this Agreement. If any Confirmation issued or entered into in respect of one or more Outstanding Power Transactions was issued or entered into pursuant to the terms of a master agreement or in a form that contains non-economic substantive provisions such as those relating to default and termination rights (such master agreement or the portion of such Confirmations containing such non-economic terms being referred to herein as the "Prior Master Agreement"), then the terms of the Schedule and the pre-printed form of this Agreement shall automatically supersede such Prior Master Agreement effective upon the execution of this Part [6].

(iii)    *Credit Support Documents.*   If elected under clause (j) as being applicable:

(A)    *Outstanding Credit Support.*   The parties agree that to the extent any collateral, margin, performance assurance or other similar form of credit support (such credit support, excluding guarantees, being referred to herein as "Outstanding Credit Support") is held by a party in connection with the obligations of the other party under Outstanding Power Transactions, such Outstanding Credit Support shall be deemed to have been delivered in respect of the obligations of the other party under Outstanding Power Transactions.

The parties further agree that with respect to any Outstanding Credit Support that (x) if the parties have entered into a Credit Support Document in connection with this Agreement that governs the provision of collateral, margin, performance assurance or other similar form of credit support (such Credit Support Document, an "Existing ISDA Credit Support Document") then the Outstanding Credit Support shall be deemed to constitute credit support provided under such Existing ISDA Credit Support Document and such Existing ISDA Credit Support Document shall automatically supercede any agreement between the parties pursuant to which the Outstanding Credit Support was provided (the "Outstanding Credit Support Document") effective upon the execution of this Part [6] and (y) if the parties have not entered into an Existing ISDA Credit Support Document, then the Outstanding Credit Support Document constitutes a Credit Support Document with respect to the party that provided such credit support.

(B)     *Amendments/Guaranties.*   The parties agree that they will enter into such amendments to any Outstanding Credit Support Document as may be necessary to give effect to the terms of this clause (a)(iii).   To the extent that a guaranty was delivered in connection with a party's obligations under Outstanding Power Transactions or a Prior Master Agreement, that party represents and warrants that any amendments necessary to ensure that the guaranty would extend to Transactions subject to this Agreement have been made prior to the effectiveness of this Part [6] and agrees (x) that such guaranty constitutes a Credit Support Document with respect to the obligations of such party and (y) the guarantor under such guaranty constitutes a Credit Support Provider with respect to the obligations of such party.

(b)     **Obligations and Deliveries**

(i)     ***Seller's and Buyer's Obligations.***   With respect to each Power Transaction, Seller shall sell and deliver, or cause to be delivered, the Quantity of the Product to the Delivery Point. Buyer shall purchase and receive, or cause to be received, the Quantity of the Product at the Delivery Point and shall pay Seller the Contract Price. However, with respect to options, the obligations set forth in the preceding two sentences shall only arise if the option is exercised in accordance with its terms.   Seller shall be responsible for any costs or charges imposed on or associated with the Product or its delivery of the Product up to the Delivery Point. Buyer shall be responsible for any costs or charges imposed on or associated with the Product or its receipt at and from the Delivery Point.

(ii)     ***Transmission and Scheduling.***   Seller shall arrange and be responsible for transmission service to the Delivery Point and shall Schedule or arrange for Scheduling services with its Transmission Providers, as specified by the parties in the Power Transactions, or in the absence thereof, in accordance with the practice of Transmission Providers, to deliver the Product to the Delivery Point.   Buyer shall arrange and be responsible for transmission service at and from the Delivery Point and shall Schedule or arrange for Scheduling services with its Transmission Providers to receive the Product at the Delivery Point.

(iii)     ***Force Majeure.***   To the extent either party is prevented by Force Majeure from carrying out, in whole or part, its obligations under any Power Transaction and such party (the "Claiming Party") gives notice and details of the Force Majeure to the other party (the "non-Claiming Party") as soon as practicable, then, unless the terms of the Product specify otherwise, the Claiming Party shall be excused from the performance of its obligations with respect to such Power Transaction (other than the obligation to make payments then due or becoming due with respect to performance prior to the Force Majeure).   The Claiming Party shall remedy the Force Majeure with all reasonable dispatch. The non-Claiming Party shall not be required to perform or resume performance of its obligations to the Claiming Party corresponding to the obligations of the Claiming Party excused by Force Majeure.   If the pre-printed form portion of this Agreement is the 2002 ISDA Master Agreement form, Section 5(b)(ii) of this Agreement shall not apply to any Power Transaction.

(c)     **Remedies for Failure to Deliver or Receive; Limitation on Condition Precedent**

(i)     ***Seller Failure.***   If Seller fails to Schedule and/or deliver all or part of the Product pursuant to a Power Transaction, and such failure is not excused under the terms of the Product or by Buyer's failure to perform, then Seller shall pay Buyer on the date payment would otherwise be due in respect of the month in which the failure occurred or, if "Accelerated Payment of Damages" is specified in clause (j), within five (5) Local Business Days of invoice receipt, an amount for such deficiency equal to the positive difference, if any, obtained by subtracting the

2

Contract Price from the Replacement Price (as defined below). The invoice for such amount shall include a written statement explaining in reasonable detail the calculation of such amount.

      (ii)    ***Buyer Failure.***  If Buyer fails to Schedule and/or receive all or part of the Product pursuant to a Power Transaction and such failure is not excused under the terms of the Product or by Seller's failure to perform, then Buyer shall pay Seller on the date payment would otherwise be due in respect of the month in which the failure occurred or, if "Accelerated Payment of Damages" is specified in clause (j), within five (5) Local Business Days of invoice receipt, an amount for such deficiency equal to the positive difference, if any, obtained by subtracting the Sales Price (as defined below) from the Contract Price. The invoice for such amount shall include a written statement explaining in reasonable detail the calculation of such amount.

      (iii)    ***Limitation on Condition Precedent.***  Section 2(a)(iii) of this Agreement is hereby amended by adding the following phrase at the end of clause (1) immediately before the last comma of such phrase:

      "(provided, however, that in relation to any Transaction that is a Power Transaction, if an Event of Default or a Potential Event of Default has occurred and is continuing for longer than ten (10) NERC Business Days without an Early Termination Date being designated, then the condition specified in this clause (1) shall cease to be a condition precedent to the obligations under Section 2(a)(i))."

(d)    **Payment**

      (i)    ***Billing Period.***  Unless otherwise specifically agreed upon by the parties, the calendar month shall be the standard period for all payments pursuant to any Power Transaction under this Agreement (other than (x) payments due as a result of the designation of an Early Termination Date; (y) any option premium payments; or (z) if "Accelerated Payment of Damages" is specified as being applicable, payments due pursuant to clauses (c)(i) and (c)(ii)). As soon as practicable after the end of each month, each party will render to the other party an invoice for the payment obligations, if any, incurred hereunder during the preceding month.

      (ii)    ***Timeliness of Payment.***  The parties shall designate which of the following two options shall apply with respect to the timing of when payment obligations are due in relation to Power Transactions:

Option A:  Unless otherwise agreed by the parties, all invoices for payment pursuant to a Power Transaction shall be due and payable in accordance with each party's invoice instructions on or before the later of the fifth (5th) Local Business Day of each month, or the second (2nd) Local Business Day after receipt of the invoice.

Option B:  Unless otherwise agreed by the parties, all invoices for payment pursuant to a Power Transaction shall be due and payable in accordance with each party's invoice instructions on or before the later of the twentieth (20th) day of each month, or the tenth (10th) day after receipt of the invoice or, if such day is not a Local Business Day, then on the next Local Business Day.

Each party will make payments by electronic funds transfer, or by other mutually agreeable method(s), to the account designated by the other party. Any amounts not paid by the due date will be deemed delinquent and will accrue interest at the Default Rate, such interest to be calculated from and including the due date to but excluding the date the delinquent amount is paid in full.

3

(iii)    *Payment for Options*.  The premium amount for the purchase of an option shall be paid within two (2) Local Business Days of receipt of an invoice from the option seller.  Upon exercise of an option, payment for the Product underlying such option shall be due in accordance with the applicable provisions of clauses (d)(i) and (d)(ii).

(iv)    *Power Transaction Netting*.  If the parties enter into one or more Power Transactions, which in conjunction with one or more other outstanding Power Transactions, constitute Offsetting Power Transactions, then all such Offsetting Power Transactions may, by agreement of the parties, be netted into a single Power Transaction under which:

(A)    the party obligated to deliver the greater amount of Product will deliver the difference between the total amount it is obligated to deliver and the total amount to be delivered to it under the Offsetting Power Transactions, and

(B)    the party owing the greater aggregate payment will pay the net difference owed between the parties.

Each single Power Transaction resulting under this clause shall be deemed part of the single, indivisible contractual arrangement between the parties, and once such resulting Power Transaction occurs, outstanding obligations under the Offsetting Power Transactions which are satisfied by such offset shall terminate.  For the purposes of this Part [6], "Offsetting Power Transaction" shall mean any two or more Power Transactions having the same or overlapping Delivery Period(s) (as specified in the Power Transaction), Delivery Point and payment date, where under one or more of such Power Transactions, one party is the Seller and under the other such Power Transaction(s) the same party is the Buyer.

(e)    **Limitation of Liability**

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS CLAUSE (E), THE FOLLOWING PROVISION SHALL APPLY SOLELY TO POWER TRANSACTIONS, AND NOTHING IN THIS PROVISION SHALL AFFECT THE ENFORCEABILITY OF SECTION 6 OF THIS AGREEMENT WITH RESPECT TO POWER TRANSACTIONS OR OTHERWISE.

THERE IS NO WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, AND ANY AND ALL IMPLIED WARRANTIES ARE DISCLAIMED.  THE PARTIES CONFIRM THAT THE EXPRESS REMEDIES AND MEASURES OF DAMAGES PROVIDED IN THIS AGREEMENT SATISFY THE ESSENTIAL PURPOSES HEREOF.  FOR BREACH OF ANY PROVISION FOR WHICH AN EXPRESS REMEDY OR MEASURE OF DAMAGES IS PROVIDED, SUCH EXPRESS REMEDY OR MEASURE OF DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY, THE OBLIGOR'S LIABILITY SHALL BE LIMITED AS SET FORTH IN SUCH PROVISION AND ALL OTHER REMEDIES OR DAMAGES AT LAW OR IN EQUITY ARE WAIVED.  IF NO REMEDY OR MEASURE OF DAMAGES IS EXPRESSLY PROVIDED HEREIN OR IN A POWER TRANSACTION, THE OBLIGOR'S LIABILITY SHALL BE LIMITED TO DIRECT ACTUAL DAMAGES ONLY, SUCH DIRECT ACTUAL DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY AND ALL OTHER REMEDIES OR DAMAGES AT LAW OR IN EQUITY ARE WAIVED.  TO THE EXTENT ANY DAMAGES REQUIRED TO BE PAID HEREUNDER ARE LIQUIDATED, THE PARTIES ACKNOWLEDGE THAT THE DAMAGES ARE DIFFICULT OR IMPOSSIBLE TO DETERMINE, OR OTHERWISE OBTAINING AN ADEQUATE REMEDY IS INCONVENIENT AND THE DAMAGES

CALCULATED HEREUNDER CONSTITUTE A REASONABLE APPROXIMATION OF THE HARM OR LOSS. NEITHER PARTY SHALL BE LIABLE FOR CONSEQUENTIAL, INCIDENTAL, PUNITIVE, EXEMPLARY OR INDIRECT DAMAGES, LOST PROFITS OR OTHER BUSINESS INTERRUPTION DAMAGES, BY STATUTE, IN TORT OR CONTRACT, UNDER ANY INDEMNITY PROVISION OR OTHERWISE. IT IS THE INTENT OF THE PARTIES THAT THE LIMITATIONS HEREIN IMPOSED ON REMEDIES AND THE MEASURE OF DAMAGES BE WITHOUT REGARD TO THE CAUSE OR CAUSES RELATED THERETO, INCLUDING THE NEGLIGENCE OF ANY PARTY, WHETHER SUCH NEGLIGENCE IS SOLE, JOINT OR CONCURRENT, OR ACTIVE OR PASSIVE.

(f)     **Taxes**

(i)     *Cooperation*. Each party shall use reasonable effort to implement the provisions of and to administer this Agreement insofar as it applies to Power Transactions in accordance with the intent of the parties to minimize all Taxes, so long as neither party is materially adversely affected by such efforts.

(ii)     *Taxes*. Notwithstanding Section 2(d) of this Agreement, Seller shall pay or cause to be paid all Taxes imposed by any government authority on or with respect to the Product or a Power Transaction arising prior to the Delivery Point. Buyer shall pay or cause to be paid all Taxes on or with respect to the Product or a Power Transaction at and from the Delivery Point (other than ad valorem, franchise or income taxes which are related to the sale of the Product and are, therefore, the responsibility of the Seller). In the event Seller is required by law or regulation to remit or pay Taxes which are Buyer's responsibility hereunder, Buyer shall promptly reimburse Seller for such Taxes. If Buyer is required by law or regulation to remit or pay Taxes which are Seller's responsibility hereunder, Buyer may deduct the amount of any such Taxes from the sums due to Seller under this Agreement. Nothing shall obligate or cause a party to pay or be liable to pay any Taxes for which it is exempt under the law.

(g)     **Title, Risk of Loss and Indemnity**

(i)     *Title and Risk of Loss*. Title to and risk of loss related to the Product shall transfer from Seller to Buyer at the Delivery Point. Seller warrants that it will deliver to Buyer the Quantity of the Product free and clear of all liens, security interests, claims and encumbrances or any interest therein or thereto by any person arising prior to the Delivery Point.

(ii)     *Indemnity*. Each party shall indemnify, defend and hold harmless the other party from and against any Claims arising from or out of any event, circumstance, act or incident first occurring or existing during the period when control and title to Product is vested in such party as provided for herein. Each party shall indemnify, defend and hold harmless the other party against any Taxes for which such party is responsible.

(h)     **Miscellaneous**

(i)     *Tariff*. Seller agrees to provide service to Buyer, and Buyer agrees to pay Seller for such service, in accordance with Seller's Tariff, if any, and the terms of this Agreement. Each party agrees that if it seeks to amend any Tariff during the term of this Agreement, such amendment will not in any way affect outstanding Power Transactions under this Agreement without the prior written consent of the other party. Each party further agrees that it will not assert, or defend itself, on the basis that any applicable Tariff is inconsistent with this Agreement. For the purposes of this Part [6] "FERC" shall mean the Federal Energy Regulatory Commission. Each of the Party A FERC Electric Tariff and the Party B FERC Electric Tariff is referred to

5

herein as a "Tariff" and collectively as the "Tariffs", which Tariffs, to the extent applicable as set forth in clause (j), are incorporated herein.

(ii)　　*Severability.* If elected under clause (j) as being applicable with respect to Power Transactions only, any provision of this Agreement declared or rendered unlawful by any applicable court or law or regulatory agency or deemed unlawful because of a statutory change (individually or collectively, such events being referred to herein as a "Regulatory Event") will not otherwise affect the remaining lawful obligations that arise under this Agreement. The parties agree that if a Regulatory Event occurs, they will use their best efforts to reform this Agreement with respect to Power Transactions only to give effect to the original intention of the parties; provided, however, that nothing in this provision shall affect the enforceability of Sections 5 or 6 of this Agreement with respect to Power Transactions or otherwise.

(iii)　　*FERC Standard of Review; Certain Covenants and Waivers.* If elected under clause (j) as being applicable:

(A)　　Absent the agreement of all parties to the proposed change, the standard of review for changes to any provision of this Agreement (including all Power Transactions and/or Confirmations) specifying the rate(s) or other material economic terms and conditions agreed to by the parties herein, whether proposed by a party, a non-party or FERC acting *sua sponte*, shall be the "public interest" standard of review set forth in United Gas Pipe Line Co. v. Mobile Gas Service Corp., 350 U.S. 332 (1956) and Federal Power Commission v. Sierra Pacific Power Co., 350 U.S. 348 (1956)(the "Mobile-Sierra" doctrine).

(B)　　The parties, for themselves and their successors and assigns, (y) agree that this "public interest" standard of review shall apply to any proposed changes in any other documents, instruments or other agreements executed or entered into by the parties in connection with this Agreement and (z) hereby expressly and irrevocably waive any rights they can or may have to the application of any other standard of review, including the "just and reasonable" standard, provided that this standard of review and the other provisions of this clause (h)(iii) shall only apply to proceedings before the FERC or appeals thereof.

(C)　　In addition, and notwithstanding the foregoing clauses (h)(iii)(A) and (B), to the fullest extent permitted by applicable law, each party, for itself and its successors and assigns, hereby expressly and irrevocably waives any rights it can or may have, now or in the future, whether under Sections 205 and/or 206 of the Federal Power Act or otherwise, to seek to obtain from FERC by any means, directly or indirectly (through complaint, investigation or otherwise), and each hereby covenants and agrees not at any time to seek to so obtain, an order from FERC changing any provision of this Agreement (including any applicable Power Transactions and/or Confirmations) specifying the rate(s) or other material economic terms and conditions agreed to by the parties, it being the express intent of the parties that, to the fullest extent permitted by applicable law, the "sanctity of contract" principles acknowledged by FERC in its Notice of Proposed Policy Statement (issued August 1, 2002) in Docket No. PL02-7-000, Standard of Review for Proposed Changes to Market-Based Rate Contracts for Wholesale Sales of Electric Energy by Public Utilities ("NPPS") shall prevail and neither of them shall unilaterally seek to obtain from FERC any relief changing the rate(s) and/or other material economic terms and conditions of their agreement(s), as set forth in this Agreement and in any Power Transactions or Confirmations, notwithstanding any subsequent changes in applicable law or market conditions that may occur. In the event it were to be determined that applicable law precludes the parties from waiving their rights to seek changes from FERC to their market-based power sales contracts (including entering into covenants not to do so) then this clause (h)(iii) shall not apply, provided

6

that, consistent with clause (h)(iii) neither party shall seek any such changes except under the "public interest" standard of review and otherwise as set forth in clauses (h)(iii)(A) and (B).

(D)    In connection with the foregoing, the parties acknowledge that, pursuant to the NPPS, FERC has invited interested persons to submit comments with respect to the provisions thereof and therefore agree that, if and to the extent FERC adopts in a final or subsequent policy statement ("FPS") the use of specific language which varies from that set out in clause (h)(iii)(A) above, then clause (h)(iii)(A) shall, without further action of either party, be deemed amended to reflect such specific language, provided that to the extent that the specific language adopted in an FSP is in any way inconsistent with the mutual intent of the parties in this regard as currently set forth in clauses (h)(iii)(A) and (B), then the parties agree to meet to attempt to negotiate in good faith an amendment to this clause (h)(iii) to address such inconsistencies, provided further that neither party shall be obligated in any way to agree to any such amendment if to do so would be inconsistent with such current mutual intent as expressed herein or would expose such party in any way to greater risk of changes being ordered by FERC to the parties' agreement as set forth in this Agreement and any Power Transactions and/or Confirmations.

(i)    **Certain Modifications to this Agreement**

(i)    *Single Agreement: Section 1(c).* With respect to all Power Transactions, the words ", the Tariffs, if any" are hereby added immediately following "this Master Agreement" in Section 1(c) of this Agreement.

(ii)    *Events of Default: Sections 5(a)(i) and 5(a)(ii)(1).*

(A)    With respect to all Power Transaction, the words "or delivery" are hereby deleted in Section 5(a)(i) of this Agreement.

(B)    With respect to all Power Transaction, the words "(or to deliver or receive the Product, the exclusive remedy for which is provided in clause (c) of Part [6] of the Schedule)" are hereby added at the end of the parenthetical of Section [5(a)(ii)][5(a)(ii)(1)] of this Agreement.

(iii)    *Effect of Designating an Early Termination Date: Section 6(c)(i).* Section 6(c)(i) of this Agreement is hereby amended by adding the following phrase at the end of such section:

"(it being understood, that to the extent in the reasonable opinion of the Non-defaulting Party or the Non-Affected Party, as the case may be, any of the Terminated Transactions that are Power Transactions may not be liquidated and terminated under applicable law on the Early Termination Date, then such Terminated Transactions shall be liquidated and terminated as soon as thereafter as is reasonably practicable)".

(iv)    *Definitions: Section 14.* Section 14 of this Agreement is hereby amended by adding the following definitions:

"Buyer" means the party to a Power Transaction that is obligated to purchase and receive, or cause to be received, the Product, as specified in a Power Transaction.

"Contract Price" means the price in U.S. Dollars (unless otherwise provided for) to be paid by Buyer to Seller for the purchase of the Product, as specified in a Power Transaction.

"Delivery Point" means the point at which the Product will be delivered and received as specified in a Power Transaction.

"Force Majeure" means an event or circumstance which prevents the Claiming Party from performing its obligations under one or more Power Transactions, which event or circumstance was not anticipated as of the date the Power Transaction was agreed to, which is not within the reasonable control of, or the result of the negligence of, the Claiming Party, and which, by the exercise of due diligence, the Claiming Party is unable to overcome or avoid or cause to be avoided. Force Majeure shall not be based on (i) the loss of Buyer's markets; (ii) Buyer's inability economically to use or resell the Product purchased hereunder; (iii) the loss or failure of Seller's supply; or (iv) Seller's ability to sell the Product at a price greater than the Contract Price. Neither party may raise a claim of Force Majeure based in whole or in part on curtailment by the Transmission Provider unless (i) such party has contracted for firm transmission with a Transmission Provider for the Product to be delivered to or received at the Delivery Point and (ii) such curtailment is due to "force majeure" or "uncontrollable force" or a similar term as defined under the Transmission Provider's tariff; provided, however, that existence of the foregoing factors shall not be sufficient to conclusively or presumptively prove the existence of a Force Majeure absent a showing of other facts and circumstances which in the aggregate with such factors establish that a Force Majeure as defined in the first sentence hereof has occurred. The applicability of Force Majeure to the Power Transaction is governed by the terms of the Products and the Related Definitions contained in Schedule P.

"NERC Business Day" means any day except a Saturday, Sunday or a holiday as defined by the North American Electric Reliability Council or any successor organization thereto. A NERC Business Day shall open at 8:00 a.m. and close at 5:00 p.m. local time for the relevant party's place of business. The relevant party, in each instance unless otherwise specified, shall be the party to whom the notice, payment or delivery is being sent and by whom the notice or payment or delivery is to be received.

"Product" means electric capacity, energy or other product(s) related thereto specified in a Power Transaction by reference to a Product listed in Schedule P, which is incorporated herein, or as otherwise specified by the parties in the Power Transaction.

"Quantity" means the quantity of the Product that Seller agrees to make available or sell and deliver, or cause to be delivered, to Buyer, and that Buyer agrees to purchase and receive, or cause to be received, from Seller, as specified in a Power Transaction.

"Replacement Price" means (A) the price at which Buyer, acting in a commercially reasonable manner, purchases at the Delivery Point a replacement for any Product specified in a Power Transaction but not delivered by Seller, plus (i) costs reasonably incurred by Buyer in purchasing such substitute Product and (ii) additional transmission charges, if any, reasonably incurred by Buyer to the Delivery Point, or at Buyer's option, (B) the market price at the Delivery Point for such Product not delivered as determined by Buyer in a commercially reasonable manner; provided, however, in no event shall such price include any penalties, ratcheted demand or similar charges, nor shall Buyer be required to utilize or change its utilization of its owned or controlled assets or market positions to minimize Seller's liability. For the purposes of this definition, Buyer shall be considered to have purchased replacement Product to the extent Buyer shall have entered into one or more arrangements in a commercially reasonable manner whereby Buyer repurchases its obligation to sell and deliver the Product to another party at the Delivery Point.

"Sales Price" means (A) the price at which Seller, acting in a commercially reasonable manner, resells at the Delivery Point any Product not received by Buyer, deducting from such proceeds any (i) costs reasonably incurred by Seller in reselling such Product and (ii) additional transmission charges, if any, reasonably incurred by Seller in delivering such Product to the third party purchasers, or at Seller's option, (B) the market price at the Delivery Point for such Product not received as determined by Seller in a commercially reasonable manner; provided, however, in no event shall such price include any penalties, ratcheted demand or similar charges, nor shall Seller be required to utilize or change its utilization of its owned or controlled assets, including contractual assets, or market positions to minimize Buyer's liability. For purposes of this definition, Seller shall be considered to have resold such Product to the extent Seller shall have entered into one or more arrangements in a commercially reasonable manner whereby Seller repurchases its obligation to purchase and receive the Product from another party at the Delivery Point.

"Schedule" or "Scheduling" means the action of Seller, Buyer and/or their designated representatives, including each party's Transmission Providers, if applicable, of notifying, requesting and confirming to each other the quantity and type of Product to be delivered on any given day or days during the Delivery Period at a specified Delivery Point.

"Schedule P" means "Schedule P: Products and Related Definitions" to the Master Power Purchase & Sale Agreement published and modified from time to time by the Edison Electric Institute.

"Seller" means the party to a Power Transaction that is obligated to sell and deliver, or cause to be delivered, the Product, as specified in a Power Transaction.

"Transmission Provider" means any entity or entities transmitting or transporting Product on behalf of Seller or Buyer to or from the Delivery Point in a particular Power Transaction.

(j) **Elective Provisions**

1. (a)(ii) ___ Applicability of Part [6] to Outstanding Power Transactions. If not checked, not applicable.

2. (a)(iii)___ Applicability of Outstanding Credit Support held by a party in connection with Outstanding Power Transactions. If not checked, not applicable.

3. (c)___Accelerated Payment Damages. If not checked, not applicable.

4. (d)(ii): Timeliness of Payment

   ___ Option A

   ___ Option B

   If neither is checked, Option B shall be deemed to apply.

5. (h)(i): Wholesale Power Tariffs

   ___ Party A Electric Tariff. Tariff/Date/Docket _____

   ___ Party B Electric Tariff. Tariff/Date/Docket _____

9

_____ If not checked, not applicable.

6.    (h)(ii) __Applicability of Severability provision.  If not checked, not applicable.

7.    (h)(iii)__Applicability of FERC Standard of Review and Certain Covenants and
      Waivers.  If not checked, not applicable.

**APPENDIX 2**

**ISDA NORTH AMERICAN GAS ANNEX**
to the Schedule to the
**ISDA Master Agreement**
dated as of
between
**PPL EnergyPlus, LLC ("Party A") and**                              **("Party B")**

This Gas Annex supplements, forms part of, and is subject to the above-referenced Agreement and is part of the Schedule thereto.

**(a)**     **Physical Gas Transactions under this Agreement; Credit Support Documents**

        (i)     *Physical Gas Transactions under this Agreement*. The provisions of this Gas Annex shall apply solely to transactions between the parties for the purchase or sale of physical Gas with delivery points in North America on a Firm or Interruptible basis on a spot or forward basis or as an option to purchase or sell Gas (collectively, "Gas Transactions"). All Gas Transactions will be deemed to have been entered into in accordance with the terms of this Agreement and shall be Transactions for all purposes of this Agreement. A subsequent agreement between the parties to settle a Gas Transaction without involving a physical delivery of Gas shall not affect such Gas Transaction's status as a Gas Transaction under this Gas Annex. In the event of any inconsistency among or between the other provisions of this Agreement and this Gas Annex, this Gas Annex will govern with respect to Gas Transactions. In the event of any inconsistency between the Confirmation for a Gas Transaction and this Gas Annex, the Confirmation will govern with respect to such Gas Transaction, except as provided in clause (a)(ii) with respect to Outstanding Gas Transactions.

        (ii)     *Applicability to Outstanding Gas Transactions*. Gas Transactions executed by the parties prior to the effectiveness of this Gas Annex and selected under clause (l)(1) ("Outstanding Gas Transactions") shall be Transactions and shall be subject to the terms and conditions of this Agreement upon effectiveness of this Gas Annex, unless otherwise agreed in writing by the parties with respect to one or more specific Outstanding Gas Transactions. All confirmations evidencing such Outstanding Gas Transactions shall constitute "Confirmations" within the meaning of this Agreement that supplement, form part of and are subject to this Agreement. If any confirmation issued or entered into with respect to one or more Outstanding Gas Transactions pursuant to the terms of a master agreement or in a form that contains provisions that are not directly related to the commercial terms of the Transaction and that are inconsistent with or duplicative of the terms and conditions of this Agreement (such master agreement or the portion of such Confirmation containing such non-commercial terms being referred to herein as the "Prior Master Agreement"), then, notwithstanding any provision of this Agreement to the contrary, the terms of the Schedule and the pre-printed form of this Agreement shall automatically supersede such Prior Master Agreement effective upon the effectiveness of this Gas Annex.

        (iii)     *Credit Support Documents*. If elected under clause (l) as being applicable:

        (A) *Outstanding Gas Credit Support*. The parties agree that to the extent any collateral, margin, security or other similar form of credit support (such credit support, excluding guarantees, being referred to herein as "Outstanding Gas Credit Support") is held by a party in connection with the obligations of the other party under Outstanding Gas Transactions, such Outstanding Gas Credit Support shall be deemed to have been delivered in respect of the obligations of the other party under and in connection with this Agreement.

        The parties further agree that with respect to any Outstanding Gas Credit Support that (x) if the parties have entered into a Credit Support Document in connection with this Agreement that governs the provision of collateral, margin, security or other similar form of credit support (such Credit Support Document, an "Existing ISDA Credit Support Document") then the Outstanding Gas Credit Support shall be deemed to constitute credit support provided under such Existing ISDA Credit Support Document and such Existing ISDA Credit Support Document shall automatically supersede any agreement between the parties pursuant to which the Outstanding Gas Credit Support was provided (the "Outstanding Gas Credit Support Document") effective as of the date agreed by the parties and (y) if the parties have not entered into an Existing ISDA Credit Support Document, then the Outstanding Gas Credit Support Document constitutes a Credit Support Document with respect to the party that provided such credit support.

(B)    *Amendments/Guaranties*.  The parties agree that they will enter into such amendments to any Outstanding Gas Credit Support Document as may be necessary to give effect to the terms of this clause (a)(iii).  To the extent that a guaranty was delivered in connection with a party's obligations under Outstanding Gas Transactions or a Prior Master Agreement, that party represents and warrants that any amendments necessary to ensure that the guaranty would extend to Transactions subject to this Agreement have been made prior to the effectiveness of this Gas Annex and agrees (x) that such guaranty constitutes a Credit Support Document with respect to the obligations of such party and (y) the guarantor under such guaranty constitutes a Credit Support Provider with respect to the obligations of such party.

**(b)    Performance Obligation**

(i)    Seller agrees to sell and deliver, and Buyer agrees to receive and purchase, the Contract Quantity for a particular Gas Transaction in accordance with the terms of this Gas Annex.  Sales and purchases will be on a Firm or Interruptible basis, as agreed to by the parties in a Gas Transaction.

(ii)    The remedy for the breach of a Firm obligation by a party shall be determined pursuant to the option below that the parties select in clause (l)(3):

Option A    *Cover Standard*:  The sole and exclusive remedy of the parties in the event of a breach of a Firm obligation to deliver or receive Gas shall be recovery of the following: (i) in the event of a breach by Seller on any Day(s), payment by Seller to Buyer in an amount equal to the positive difference, if any, between the purchase price paid by Buyer utilizing the Cover Standard and the Contract Price, adjusted for commercially reasonable differences in transportation costs to or from the Delivery Point(s), multiplied by the difference between the Contract Quantity and the quantity actually delivered by Seller for such Day(s); or (ii) in the event of a breach by Buyer on any Day(s), payment by Buyer to Seller in the amount equal to the positive difference, if any, between the Contract Price and the price received by Seller utilizing the Cover Standard for the resale of such Gas, adjusted for commercially reasonable differences in transportation costs to or from the Delivery Point(s), multiplied by the difference between the Contract Quantity and the quantity actually taken by Buyer for such Day(s); or (iii) in the event that Buyer has used commercially reasonable efforts to replace the Gas or Seller has used commercially reasonable efforts to sell the Gas to a third party, and no such replacement or sale is available, then the sole and exclusive remedy of the performing party shall be any unfavorable difference between the Contract Price and the Spot Price, adjusted for such transportation to the applicable Delivery Point, multiplied by the difference between the Contract Quantity and the quantity actually delivered by Seller and received by Buyer for such Day(s).  Imbalance Charges shall not be recovered under this clause (b)(ii), but Seller and/or Buyer shall be responsible for Imbalance Charges, if any, as provided in clause (c)(iii) of this Gas Annex.  The amount of such unfavorable difference shall be payable five Local Business Days after presentation of the performing party's invoice, which shall set forth the basis upon which such amount was calculated.

Option B    *Spot Price Standard*:  The sole and exclusive remedy of the parties in the event of a breach of a Firm obligation to deliver or receive Gas shall be recovery of the following: (i) in the event of a breach by Seller on any Day(s), payment by Seller to Buyer in an amount equal to the difference between the Contract Quantity and the actual quantity delivered by Seller and received by Buyer for such Day(s), multiplied by the positive difference, if any, obtained by subtracting the Contract Price from the Spot Price; or (ii) in the event of a breach by Buyer on any Day(s), payment by Buyer to Seller in an amount equal to the difference between the Contract Quantity and the actual quantity delivered by Seller and received by Buyer for such Day(s), multiplied by the positive difference, if any, obtained by subtracting the applicable Spot Price from the Contract Price.  Imbalance Charges shall not be recovered under this clause (b)(ii), but Seller and/or Buyer shall be responsible for Imbalance Charges, if any, as provided in clause (c)(iii) of this Gas Annex. The amount of such unfavorable difference shall be payable five Local Business Days after presentation of the performing party's invoice, which shall set forth the basis upon which such amount was calculated.

(iii)    Notwithstanding clause (b)(ii) of this Gas Annex, the parties may agree to Alternative Damages in a Confirmation executed in writing by both parties.

**(c)    Transportation, Nominations and Imbalances**

(i)    Seller shall have the sole responsibility for transporting the Gas to the Delivery Point(s).  Buyer shall have the sole responsibility for transporting the Gas from the Delivery Point(s).

(ii)    The parties shall coordinate their nomination activities, giving sufficient time to meet the deadlines of the affected Transporter(s). Each party shall give the other party timely prior notice, sufficient to meet the requirements of all Transporter(s) involved in the Gas Transaction, of the quantities of Gas to be delivered and purchased each Day. Should either party become aware that actual deliveries at the Delivery Point(s) are greater or lesser than the Scheduled Gas, such party shall promptly notify the other party.

(iii)    The parties shall use commercially reasonable efforts to avoid imposition of any Imbalance Charges. If Buyer or Seller receives an invoice from a Transporter that includes Imbalance Charges, the parties shall determine the validity as well as the cause of such Imbalance Charges. If the Imbalance Charges were incurred as a result of Buyer's receipt of quantities of Gas greater than or less than the Scheduled Gas, then Buyer shall pay for such Imbalance Charges or reimburse Seller for such Imbalance Charges paid by Seller. If the Imbalance Charges were incurred as a result of Seller's delivery of quantities of Gas greater than or less than the Scheduled Gas, then Seller shall pay for such Imbalance Charges or reimburse Buyer for such Imbalance Charges paid by Buyer. "Unpaid Amounts" as defined in Section 14 of this Agreement shall include unpaid Imbalance Charges, if any.

**(d)    Quality and Measurement**

All Gas delivered by Seller shall meet the pressure, quality and heat content requirements of the Receiving Transporter. The unit of quantity measurement for purposes of Gas Transactions shall be one MMBtu dry. Measurement of Gas quantities hereunder shall be in accordance with the established procedures of the Receiving Transporter.

**(e)    Taxes**

The Taxes payable by a party shall be determined pursuant to the option below that the parties select in clause (l)(4):

Option A: ***Buyer Pays At and After Delivery Point***: Seller shall pay or cause to be paid all taxes, fees, levies, penalties, licenses or charges imposed by any government authority ("Taxes") on or with respect to the Gas prior to the Delivery Point(s). Buyer shall pay or cause to be paid all Taxes on or with respect to the Gas at the Delivery Point(s) and all Taxes after the Delivery Point(s). If a party is required to remit or pay Taxes that are the other party's responsibility hereunder, the party responsible for such Taxes shall promptly reimburse the other party for such Taxes. Any party entitled to an exemption from any such Taxes or charges shall furnish the other party any necessary documentation thereof.

Option B: ***Seller Pays Before and At Delivery Point***. Seller shall pay or cause to be paid all taxes, fees, levies, penalties, licenses or charges imposed by any government authority ("Taxes") on or with respect to the Gas prior to the Delivery Point(s) and all Taxes at the Delivery Point(s). Buyer shall pay or cause to be paid all Taxes on or with respect to the Gas after the Delivery Point(s). If a party is required to remit or pay Taxes that are the other party's responsibility hereunder, the party responsible for such Taxes shall promptly reimburse the other party for such Taxes. Any party entitled to an exemption from any such Taxes or charges shall furnish the other party any necessary documentation thereof.

**(f)    Billing, Payment and Audit**

(i)    Seller shall invoice Buyer for Gas delivered and received in the preceding Month and for any other applicable charges, providing supporting documentation acceptable in industry practice to support the amount charged. If the actual quantity delivered is not known by the billing date, billing will be prepared based on the quantity of Scheduled Gas. The invoiced quantity will then be adjusted to the actual quantity on the following Month's billing or as soon thereafter as actual delivery information is available.

(ii)    Buyer shall remit the amount due under clause (f)(i) of this Gas Annex, in immediately available funds to the account specified from time to time by Seller, on or before the Payment Date elected in clause (l)(5) of this Gas Annex. In the event any payments are due Buyer hereunder, payment to Buyer shall be made in accordance with this clause (f)(ii).

(iii)    In the event payments become due pursuant to clauses (b)(ii) or (b)(iii) of this Gas Annex, the performing party may submit an invoice to the nonperforming party for an accelerated payment setting forth the basis upon which the invoiced amount was calculated. Payment from the nonperforming party will be due five Local Business Days after receipt of invoice.

(iv)    If the invoiced party, in good faith, disputes the amount of any such invoice or any part thereof, such invoiced party will pay such amount as it concedes to be correct; provided, however, if the invoiced party disputes the amount due, it must provide supporting documentation acceptable in industry practice to support the amount paid or disputed. In the event the parties are unable to resolve such dispute, either party may pursue any remedy available at law or in equity to enforce its rights pursuant to this clause (f).

(v)    A party shall have the right, at its own expense, upon reasonable notice and at reasonable times, to examine and audit and to obtain copies of the relevant portion of the books, records, and telephone recordings of the other party only to the extent reasonably necessary to verify the accuracy of any statement, charge, payment, or computation made under this Gas Annex. This right to examine, audit, and to obtain copies shall not be available with respect to proprietary information not directly relevant to Gas Transactions under this Gas Annex. All invoices and billings shall be conclusively presumed final and accurate and all associated claims for under- or overpayments shall be deemed waived unless such invoices or billings are objected to in writing, with adequate explanation and/or documentation, within two years after the Month of Gas delivery. All retroactive adjustments under clause (f) of this Gas Annex shall be paid in full by the party owing payment within 30 Days of notice and substantiation of such inaccuracy.

**(g)    Title, Warranty and Indemnity**

(i)    Unless otherwise specifically agreed, title to the Gas shall pass from Seller to Buyer at the Delivery Point(s). Seller shall have responsibility for and assume any liability with respect to the Gas prior to its delivery to Buyer at the specified Delivery Point(s). Buyer shall have responsibility for and assume any liability with respect to said Gas after its delivery to Buyer at the Delivery Point(s).

(ii)    Seller warrants that it will have the right to convey and will transfer good and merchantable title to all Gas sold hereunder and delivered by it to Buyer, free and clear of all liens, encumbrances, and claims. EXCEPT AS PROVIDED IN THIS CLAUSE (g)(ii), ALL OTHER WARRANTIES WITH RESPECT TO GAS, EXPRESS OR IMPLIED, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR OF FITNESS FOR ANY PARTICULAR PURPOSE, ARE DISCLAIMED.

(iii)    Seller agrees to indemnify Buyer and save it harmless from all losses, liabilities or claims including reasonable attorneys' fees and costs of court ("Claims"), from any and all persons, arising from or out of claims of title, personal injury or property damage from said Gas or other charges thereon which attach before title passes to Buyer. Buyer agrees to indemnify Seller and save it harmless from all Claims, from any and all persons, arising from or out of claims regarding payment, personal injury or property damage from said Gas or other charges thereon which attach after title passes to Buyer.

(iv)    Notwithstanding the other provisions of this clause (g) of this Gas Annex, as between Seller and Buyer, Seller will be liable for all Claims to the extent that such arise from the failure of Gas delivered by Seller to meet the quality requirements of clause (d) of this Gas Annex.

**(h)    Force Majeure**

(i)    Except with regard to a party's obligation to make payment(s) due under clause (f) of this Gas Annex, Section 6 (e) of this Agreement and Imbalance Charges under clause (c)(iii) of this Gas Annex, neither party shall be liable to the other for failure to perform a Firm obligation, to the extent such failure was caused by Force Majeure. The term "Force Majeure" as employed herein means any cause not reasonably within the control of the party claiming suspension, as further defined in clause (h)(ii) of this Gas Annex.

(ii)    Force Majeure shall include, but not be limited to, the following: (A) physical events such as acts of God, landslides, lightning, earthquakes, fires, storms or storm warnings, such as hurricanes, which result in evacuation of the affected area, floods, washouts, explosions, breakage or accident or necessity of repairs to machinery or equipment or lines of pipe; (B) weather related events affecting an entire geographic region, such as low temperatures which cause freezing or failure of wells or lines of pipe; (C) interruption and/or curtailment of Firm transportation and/or storage by Transporters; (D) acts of others such as strikes, lockouts or other industrial disturbances, riots, sabotage, insurrections or

wars; and (E) governmental actions such as necessity for compliance with any court order, law, statute, ordinance, regulation, or policy having the effect of law promulgated by a governmental authority having jurisdiction. Seller and Buyer shall make reasonable efforts to avoid the adverse impacts of a Force Majeure and to resolve the event or occurrence once it has occurred in order to resume performance.

(iii)    Neither party shall be entitled to the benefit of the provisions of Force Majeure to the extent performance is affected by any or all of the following circumstances: (A) the curtailment of interruptible or secondary Firm transportation unless primary, in-path, Firm transportation is also curtailed; (B) the party claiming excuse failed to remedy the condition and to resume the performance of such covenants or obligations with reasonable dispatch; or (C) economic hardship, to include, without limitation, Seller's ability to sell Gas at a higher or more advantageous price than the Contract Price, Buyer's ability to purchase Gas at a lower or more advantageous price than the Contract Price, or a regulatory agency disallowing, in whole or in part, the pass through of costs resulting from this Agreement; (D) the loss of Buyer's market(s) or Buyer's inability to use or resell Gas purchased hereunder, except, in either case, as provided in clause (h)(ii) of this Gas Annex; (E) the loss or failure of Seller's gas supply or depletion of reserves, except, in either case, as provided in clause (h)(ii) of this Gas Annex. The party claiming Force Majeure shall not be excused from its responsibility for Imbalance Charges.

(iv)    Notwithstanding anything to the contrary herein, the parties agree that the settlement of strikes, lockouts or other industrial disturbances shall be within the sole discretion of the party experiencing such disturbance.

(v)    The party whose performance is prevented by Force Majeure must provide notice to the other party. Initial notice may be given orally; however, written notice with reasonably full particulars of the event or occurrence is required as soon as reasonably possible. Upon providing written notice of Force Majeure to the other party, the affected party will be relieved of its obligation, from the onset of the Force Majeure event, to make or accept delivery of Gas, as applicable, to the extent and for the duration of Force Majeure, and neither party shall be deemed to have failed in such obligations to the other during such occurrence or event.

(vi)    Notwithstanding clauses (h)(ii) and (h)(iii) of this Gas Annex, the parties may agree to alternative Force Majeure provisions in a Confirmation executed in writing by both parties.

If the pre-printed form portion of this Agreement is the 2002 ISDA Master Agreement form, Section 5(b)(ii) of this Agreement shall not apply to any Gas Transaction.

(i)    **Limitation of Liability**

FOR BREACH OF ANY PROVISION FOR WHICH AN EXPRESS REMEDY OR MEASURE OF DAMAGES IS PROVIDED, SUCH EXPRESS REMEDY OR MEASURE OF DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY. A PARTY'S LIABILITY HEREUNDER SHALL BE LIMITED AS SET FORTH IN SUCH PROVISION, AND ALL OTHER REMEDIES OR DAMAGES AT LAW OR IN EQUITY ARE WAIVED. IF NO REMEDY OR MEASURE OF DAMAGES IS EXPRESSLY PROVIDED HEREIN OR IN A GAS TRANSACTION, A PARTY'S LIABILITY SHALL BE LIMITED TO DIRECT ACTUAL DAMAGES ONLY. SUCH DIRECT ACTUAL DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY, AND ALL OTHER REMEDIES OR DAMAGES AT LAW OR IN EQUITY ARE WAIVED. UNLESS EXPRESSLY HEREIN PROVIDED, NEITHER PARTY SHALL BE LIABLE FOR CONSEQUENTIAL, INCIDENTAL, PUNITIVE, EXEMPLARY OR INDIRECT DAMAGES, LOST PROFITS OR OTHER BUSINESS INTERRUPTION DAMAGES, BY STATUTE, IN TORT OR CONTRACT, UNDER ANY INDEMNITY PROVISION OR OTHERWISE. IT IS THE INTENT OF THE PARTIES THAT THE LIMITATIONS HEREIN IMPOSED ON REMEDIES AND THE MEASURE OF DAMAGES BE WITHOUT REGARD TO THE CAUSE OR CAUSES RELATED THERETO, INCLUDING THE NEGLIGENCE OF ANY PARTY, WHETHER SUCH NEGLIGENCE BE SOLE, JOINT OR CONCURRENT, OR ACTIVE OR PASSIVE. TO THE EXTENT ANY DAMAGES REQUIRED TO BE PAID HEREUNDER ARE LIQUIDATED, THE PARTIES ACKNOWLEDGE THAT THE DAMAGES ARE DIFFICULT OR IMPOSSIBLE TO DETERMINE, OR OTHERWISE OBTAINING AN ADEQUATE REMEDY IS INCONVENIENT AND THE DAMAGES CALCULATED HEREUNDER CONSTITUTE A REASONABLE APPROXIMATION OF THE HARM OR LOSS.

(j)    **Certain Amendments to this Agreement for Gas Transactions**

(i)    *Section 5(a)(i).*  With respect to all Gas Transactions, the words "or delivery under Section 2(a)(i) or 2(e)" in the second line of Section 5(a)(i) of this Agreement and, if the pre-printed form portion of this Agreement is the 2002 ISDA Master Agreement form, the words "or the first Local Delivery Day in the case of any such delivery" and ", in each case," in the third and fourth lines of Section 5(a)(i) of this Agreement, are hereby deleted.

(ii)    *Section 5(a)(ii).*  With respect to all Gas Transactions, the words "or delivery under Section 2(a)(i) or 2(e)" in the second line of Section 5(a)(ii) are hereby deleted and the words "or to deliver or receive Gas, the exclusive remedy for which is provided in clause (b)(ii) of the Gas Annex to the Schedule" are hereby added at the end of the parenthetical of Section 5(a)(ii) if the pre-printed form portion of this Agreement is the 1992 ISDA Master Agreement form or Section 5(a)(ii)(1) if the pre-printed form portion of this Agreement is the 2002 ISDA Master Agreement form.

(iii)    *Section 5(a)(v).*  With respect to all Gas Transactions, (A) if the pre-printed form portion of this Agreement is the 1992 ISDA Master Agreement, the parenthetical "(other than by failing to make a delivery)" is inserted after the word "defaults" in clause (1) of Section 5(a)(v) and the words "or delivery" in clause (2) of Section 5(a)(v) of this Agreement are deleted; and (B) if the pre-printed form portion of this Agreement is the 2002 ISDA Master Agreement, the words "(including any delivery due on the last delivery or exchange date of) a Specified Transaction or" in clause (3) of Section 5(a)(v) of this Agreement are deleted.

**(k)**    **Definitions.**  For purposes of this Gas Annex, the following definitions apply:

(i)    "Alternative Damages" shall mean such damages, expressed in dollars or dollars per MMBtu, as the parties shall agree upon in the Transaction Confirmation, in the event either Seller or Buyer fails to perform a Firm obligation to deliver Gas in the case of Seller or to receive Gas in the case of Buyer.

(ii)    "British thermal unit" or "Btu" shall mean the International BTU, which is also called the Btu (IT).

(iii)    "Buyer" shall mean the party receiving Gas under a Gas Transaction.

(iv)    "Contract Price" shall mean the amount expressed in U.S. Dollars per MMBtu to be paid by Buyer to Seller for the purchase of Gas as agreed to by the parties in a Gas Transaction.

(v)    "Contract Quantity" shall mean the quantity of Gas to be delivered and taken as agreed to by the parties in a Gas Transaction.

(vi)    "Cover Standard" shall mean that if there is an unexcused failure to take or deliver any quantity of Gas pursuant to this Gas Annex, then the performing party shall use commercially reasonable efforts to (i) if Buyer is the performing party, obtain Gas, (or an alternate fuel if elected by Buyer and replacement Gas is not available),or (ii) if Seller is the performing party, sell Gas, in either case, at a price reasonable for the delivery or production area, as applicable, consistent with:  the amount of notice provided by the nonperforming party; the immediacy of the Buyer's Gas consumption needs or Seller's Gas sales requirements, as applicable; the quantities involved; and the anticipated length of failure by the nonperforming party.

(vii)    "Day" shall mean a period of 24 consecutive hours, coextensive with a "day" as defined by the Receiving Transporter in a particular transaction.

(viii)    "Delivery Period" shall be the period during which deliveries are to be made as agreed to by the parties in a Gas Transaction.

(ix)    "Delivery Point(s)" shall mean such point(s) as are agreed to by the parties in a Gas Transaction.

(x)    "EFP" shall mean, when used in a Confirmation of a Gas Transaction, the purchase, sale or exchange of natural Gas as the "physical" side of an exchange for physical transaction involving gas futures contracts.  EFP shall incorporate the meaning and remedies of "Firm", provided that a party's excuse for nonperformance of its obligations to deliver or receive Gas will be governed by the rules of the relevant futures exchange regulated under the U.S. Commodity Exchange Act (7 U.S. Code 1, as amended).

(xi)    "Firm" shall mean that either party may interrupt its performance without liability only to the extent that such performance is prevented for reasons of Force Majeure; provided, however, that during Force Majeure interruptions, the party invoking Force Majeure may be responsible for any Imbalance Charges as set forth in

clause (c)(iii) of this Gas Annex related to its interruption after the nomination is made to the Transporter and until the change in deliveries and/or receipts is confirmed by the Transporter.

(xii) "Gas" shall mean any mixture of hydrocarbons and noncombustible gases in a gaseous state consisting primarily of methane.

(xiii) "Imbalance Charges" shall mean any fees, penalties, costs or charges (in cash or in kind) assessed by a Transporter for failure to satisfy the Transporter's balance and/or nomination requirements.

(xiv) "Interruptible" shall mean that either party may interrupt its performance at any time for any reason, whether or not caused by an event of Force Majeure, with no liability, except such interrupting party may be responsible for any Imbalance Charges as set forth in clause (c)(iii) of this Gas Annex related to its interruption after the nomination is made to the Transporter and until the change in deliveries and/or receipts is confirmed by Transporter.

(xv) "MMBtu" shall mean one million British thermal units, which is equivalent to one dekatherm.

(xvi) "Month" shall mean the period beginning on the first Day of the calendar month and ending immediately prior to the commencement of the first Day of the next calendar month.

(xvii) "Payment Date" shall mean the payment date for Gas Transactions under this Gas Annex, as specified in clause (l)(5) of this Gas Annex.

(xviii) "Receiving Transporter" shall mean the Transporter receiving Gas at a Delivery Point, or absent such receiving Transporter, the Transporter delivering Gas at a Delivery Point.

(xix) "Scheduled Gas" shall mean the quantity of Gas confirmed by Transporter(s) for movement, transportation or management.

(xx) "Seller" means the party delivering Gas under a Gas Transaction.

(xxi) "Spot Price" as referred to in clause (b)(ii) of this Gas Annex shall mean the price published as the Spot Price Index for the relevant Day; provided, if there is no single price published as the Spot Price Index for such location for such Day, but there is published a range of prices, then the Spot Price shall be the average of such high and low prices. If no price or range of prices is published for such Day, then the Spot Price shall be the average of the following: (i) the price (determined as stated above) for the first Day for which a price or range of prices is published that next precedes the relevant Day; and (ii) the price (determined as stated above) for the first Day for which a price or range of prices is published that next follows the relevant Day.

(xxii) "Spot Price Index" shall mean, with respect to a Gas Transaction, unless otherwise specified in the Confirmation for that Transaction, the "Daily Midpoint" price set forth in Gas Daily (published by Platts), or any successor publication, in the column "Daily Price Survey" under the listing applicable to the geographic location closest in proximity to the Delivery Point(s) for the relevant Day or, if an alternative index or price is specified in clause (l)(6) below, such alternative index or price.

(xxiii) "Transporter(s)" shall mean all Gas gathering or pipeline companies, or local distribution companies, acting in the capacity of a transporter, transporting Gas for Seller or Buyer upstream or downstream, respectively, of the Delivery Point pursuant to a particular Gas Transaction.

**(l)    Elective Provisions**

**1.    (a)(ii) – Outstanding Gas Transactions.** This Gas Annex shall apply to the following pre-existing Gas Transactions pursuant to clause (a)(ii):

__ Option A:  All Gas Transactions outstanding between the parties as of the date this Gas Annex becomes effective.

__ Option B:  The Gas Transactions listed in Schedule 1 to this Gas Annex.

__ Option C:  None of the Gas Transactions between the parties that were executed prior to the date this Gas Annex becomes effective.

If none of the above options is selected, Option A shall apply.

**2.    (a)(iii) – Outstanding Gas Credit Support.**

__ Outstanding Gas Credit Support held by a party in connection with Outstanding Gas Transactions shall be deemed to have been delivered under and in connection with this Agreement pursuant to clause (a)(iii). If not checked, not applicable.

3.  **(b)(ii) – Performance Obligation** (remedy for breach of Firm obligation)

__ Option A:  Cover Standard

__ Option B:  Spot Price Standard

If neither option is selected, Option A shall apply.

4.  **(e) – Taxes**

__   Option A: Buyer Pays At and After Delivery Point

__   Option B: Seller Pays Before and At Deliver Point

If neither option is selected, Option A shall apply.

5.  **(f)(ii) – Payment Date**

__ Option A: the later of the 25th Day of Month following Month of delivery or 10 Days after receipt of the invoice by Buyer (provided that if the Payment Date is not a Local Business Day, payment is due on the next Local Business Day following that date).

___ Option B: the later of the ___ Day of Month following Month of delivery or 10 Days after receipt of the invoice by Buyer (provided that if the Payment Date is not a Local Business Day, payment is due on the next Local Business Day following that date).

___ Option C: Notwithstanding anything to the contrary in the Schedule, payments with respect to both Gas Transactions and Gas Transactions (as defined separately in the Schedule) will be netted and payable on or before the later of the 20th Day of Month following Month of delivery or 10 Days after receipt of the invoice by Buyer (provided that if the Payment Date is not a Local Business Day, payment is due on the next Local Business Day following that date).

___ Option D: Notwithstanding anything to the contrary in the Schedule, payments with respect to both Gas Transactions and Gas Transactions (as defined separately in the Schedule) will be netted and payable on or before the later of the 25th Day of Month following Month of delivery or 10 Days after receipt of the invoice by Buyer (provided that if the Payment Date is not a Local Business Day, payment is due on the next Local Business Day following that date).

If none of the above options is selected, Option A shall apply.

6.  **(k)(xxii) – Alternative to Spot Price Index.**  The parties have selected the following alternative index as the Spot Price Index: _____.  If no index is specified, the Spot Price Index specified in clause (l)(xxi) applies.

**(m)**    *Notices for Gas Transactions*

**PARTY A –**                                          **PARTY B**
Invoices:                                              Invoices:

As set forth in Part 4 of the Schedule unless otherwise    As set forth in Part 4 of the Schedule unless otherwise
set forth below:                                       set forth below:

Attn:                                           Attn:

Phone:                                          Phone:

Facsimile:                                      Facsimile:

**Nominations:**                                **Nominations:**

As set forth in Part 4 of the Schedule unless otherwise    As set forth in Part 4 of the Schedule unless otherwise
set forth below:                                set forth below:

Attn:                                           Attn:

Phone:                                          Phone:

Facsimile:                                      Facsimile:

**Confirmations:**                              **Confirmations:**

As set forth in Part 4 of the Schedule unless otherwise    As set forth in Part 4 of the Schedule unless otherwise
set forth below:                                set forth below:

Attn:                                           Attn:

Phone:                                          Phone:

Facsimile:                                      Facsimile:

**Option Exercise:**                            **Option Exercise:**

As set forth in Part 4 of the Schedule unless otherwise    As set forth in Part 4 of the Schedule unless otherwise
set forth below:                                set forth below:

Attn:                                           Attn:

Phone:                                          Phone:

Facsimile:                                      Facsimile:

☐**Wire Transfer - or – X  ACH (check one box):**    ☐**Wire Transfer - or  - ☐ACH (check one box):**
Bank:                                           Bank:
ABA:                                            ABA:
Account:                                        Account:
Other Details: _____      Other Details: _____

**(n)     Other Provisions/Modifications to this Gas Annex.**

# EXHIBIT C

OCT-10-2007 WED 01:31 PM          FAX NO.                P. 01/03

OCT-09-2007 TUE 11:21 AM              FAX NC

**COPY**

7998

### EMISSION ALLOWANCES TRANSACTION CON ─────

Trade Date: August 6, 2007
To: Saracen Merchant Energy LP
Attn: Emission Allowances Confirmations
From: PPL EnergyPlus, LLC
PPL Reference Number: 07EMIS0007
Buyer Reference Number:

*Put*                                                  *Put*
PPL EnergyPlus, LLC ("Option Seller") hereby confirms the transaction ("Transaction") originally orally concluded on the 6th day of August, 2007, by and between Option Seller & Saracen Merchant Energy LP (Option Buyer). Seller and Buyer are each a "Party" and collectively the "Parties". This confirmation constitutes a "Confirmation" as referred to herein, and supplements and forms a part of, the ISDA Master Agreement and Credit Support Annex entered into between Seller and Buyer dated as of July 31, 2007 as amended and supplemented from time to time (the "Agreement").

Option Buyer has purchased the right, but not the obligation, to sell and deliver the Annual Allowances (as defined herein) specified below, and upon Option Buyer's exercise of such option, Option Buyer will have the obligation to sell and deliver, and Option Seller (Counterparty) will have the obligation to purchase and receive such Annual Allowances under the following terms and conditions:

Strike Price: 4500.00 USD per Allowance

Quantity: 500 Allowances

Premium: 500.00 USD per Allowance payable by Option Buyer to Option Seller two (2) business days after the Trade Date or after receipt of invoice from Option Seller.

Option Exercise: One time exercise by verbal notice no later than the Option Expiration Date.

Option Expiration Date: 1:00 pm Eastern Prevailing Time on December 15, 2008.

In the event this option is not exercised by the Option Expiration Date, Option Seller shall be relieved of its obligation to pay for and receive the Annual Allowances.
        *Option*
1. Buyer: Saracen Merchant Energy LP
        *Option*
2. Seller: PPL EnergyPlus, LLC

3. Quantity: 500 annual allowances ("Annual Allowances") of the Vintage Year set forth below. An Annual Allowance means the authorization from the Environmental Protection Agency ("EPA") or any successor agency with similar jurisdiction, pursuant to the Clean Air Interstate Rule promulgated March 10, 2005, and adherent to the Federal Implementation Plan ("FIP") Annual NOx Cap and Trade Program approved by the EPA, 40 CFR Part 97, 70 FR 25162, to emit one ton of nitrogen oxide ("NOx") in a calendar year, beginning 2009.

4. Vintage Year: 2009

5. Contract Price: US Dollars 4500.00 per Annual Allowance, for a total purchase price of US Dollars 2,250,000.00.    *$ 2,250,000*

6. Annual Allowance Transfer Date: On or before December 18, 2008.

7. Transfer, Payment and Taxes:

7.1 (A) On or before the Annual Allowance Transfer Date, Seller shall effect delivery of the Annual Allowances to Buyer (from and to the accounts referenced below). For purposes hereof, delivery shall mean (i) when Seller has completed and submitted to the EPA an Allowance Transfer Form ("ATF") transferring the subject Annual Allowances from Seller's Account in the Allowance Tracking System ("Allowance Tracking System") means the system established by the EPA, including its regulations and procedures, for recording the transfer of allowances among various entities or person under the Clean Air Act as set forth in 40 C.F.R. PART 97) to Buyer's account in the Allowance Tracking System or (ii) when, in

OCT-10-2007 WED 01:31 PM                    FAX NO.                        P. 02/03

OCT-09-2007 TUE 11:21 AM                    FAX NO.                        P. 02/03

**EMISSION ALLOWANCES TRANSACTION CONFIRMATION**

the event that any of Buyer's information and/or authorization, including its authorized signature, is not on file with EPA, Seller submits the partially completed ATF to transfer the subject Annual Allowances to Buyer for Buyer's completion and submission to EPA. Title to the Allowances purchased and sold hereunder shall transfer from Seller to Buyer upon delivery of the Annual Allowances free and clear of any liens, other encumbrances or title defects.

Seller EPA ATF Account: 999900000390
Seller Representative ID: 502901/Ann Fiore

Buyer EPA ATF Account: 999900000857
Buyer Representative ID: 500447

(B) Within three (3) business days of written, facsimile or electronic notification from Seller to Buyer that the Annual Allowances have been transferred from Seller to Buyer, as indicated on the Allowance Tracking System, Seller shall forward an invoice to Buyer (a) providing evidence of the recordation of such transfer, and (b) detailing the amount owed for all Annual Allowances delivered at the Contract Price and payment instructions. Buyer shall make payment within three (3) business days of receipt of a proper invoice.

7.2  If Buyer or Seller receives notification from the EPA of non-recordation of the transfer contemplated by an ATF for this Transaction, the Parties shall promptly confer regarding such non-recordation and submit to the administrator another ATF with respect to such transfer. Each Party shall promptly furnish to the other Party any claim concerning an error in recording transfer information in respect of any Allowances transferred pursuant to this Agreement that such Party intends to submit to the Administrator. Each Party shall cooperate with the other Party in connection with and shall have the right to participate in any proceedings concerning such claim of effort, including any administrative appeals.

7.3  Each of Buyer and Seller shall be responsible, and shall indemnify the other, for any taxes or fees (including brokers' fees) for which it is responsible associated with its purchase or sale of Annual Allowances under this Transaction.

Payment Terms: Buyer shall remit payment to the account as specified below and according to the Seller's settlement instructions:

| Banking Information: | Notices: | Settlement: |
|---|---|---|
| Mellon Bank, N.A.<br>One Mellon Bank Center<br>Pittsburgh, PA 15259-0001<br><br>Bank Account No.: 2-964-823<br>ABA Routing No.: 031000037 | PPL ENERGYPLUS, LLC<br>Two North Ninth Street<br>Allentown, PA 18101-1179<br>ATTN: Contract Administration, GENPL7<br>FAX: (610) 774-5077<br>PHONE: (610) 774-2833 | Attn: Billing (GENPL7)<br>Invoice Fax: (610) 774-4511<br>Invoice Phone:(610) 774-5485<br>*Saracen Info:*<br>Account Name: Saracen Energy LP<br>Bank Name: JP Morgan Chase Bank, N.A.<br>ABA Routing Number: 021000021<br>Account Number: 707552741 |

8.  Exclusive Remedies for Failure to Purchase or Receive Annual Allowances.  *Settlement contact: Stefanie Peterson*
*Speterson @ saracenenergy.com (713)366-7016*

Seller Remedies for Failure to Purchase. If Buyer fails to purchase and receive all or part of the Quantity of Annual Allowances pursuant to this Transaction, and such failure is not otherwise excused under the terms hereof or Seller's failure to perform, then Buyer shall pay Seller an amount equal to the to the sum of (i) the purchase price for any Annual Allowances delivered to Buyer for which Seller has not been paid, if any, plus (ii) the positive difference, if any, between (a) the total purchase price set forth in this Transaction for all remaining Annual Allowances to be delivered pursuant to this Transaction and (b) the reasonable resale price of the Annual Allowances not purchased, or if such a resale is not possible, then the aggregate market price of such undelivered Annual Allowances as of the date of such failure to purchase, to be determined based upon the average of two quotes from brokerage firms or third-party intermediaries reasonably selected by Seller, plus (iii) any brokerage fees and other costs reasonably incurred by Seller in terminating any arrangement pursuant to which it hedged its obligations or entering into any replacement transactions. If Buyer has already made a partial payment to Seller, the amount owed under this provision will be decreased by that amount already paid.

OCT-10-2007 WED 01:32 PM          FAX NO.                    P. 03/03

OCT-09-2007 TUE 11:22 AM          FAX NO.                    P. 03/03

## EMISSION ALLOWANCES TRANSACTION CONFIRMATION

**Buyer Remedies for Failure to Sell.** If Seller fails to sell and deliver all or part of the Quantity of Annual Allowances pursuant to this Transaction, and such failure is not otherwise excused under the terms hereof or Buyer's failure to perform, then Seller shall pay Buyer an amount equal to the sum of (i) the positive difference, if any, between (a) the reasonable price of purchasing replacement Annual Allowances, or if such a purchase is not possible, then the aggregate market price of such undelivered Annual Allowances as of the date of such failure to sell, to be determined based upon the average of two quotes from brokerage firms or third-party intermediaries reasonably selected by Buyer, and (b) the total purchase price set forth in this Transaction for all remaining Annual Allowances to be delivered pursuant to this Transaction, but which Seller failed to deliver, plus (ii) any brokerage fees and other costs reasonably incurred by Buyer either in terminating any arrangement pursuant to which it hedged its obligations or entering into any replacement transactions.

9. **Government Action.** If the rules or regulations establishing the annual NOx program eliminate the Annual Allowances, then either Party may terminate this agreement upon written notice to the other Party.

10. **Special Provisions:** This confirmation and the terms of this Transaction shall only be modified pursuant to a written agreement signed by the Parties. In the event of any inconsistency between this confirmation and the ISDA Master Agreement, the provisions of this confirmation will prevail for this Transaction.

11. **Other.** If the above accurately reflects your understanding of our agreement, please indicate your approval by securing execution of this confirmation in the space provided below by an authorized representative of Buyer and returning it via facsimile to Seller at 610-774-7413. Failure to object to the terms of this confirmation or respond with any objections thereto within three (3) Business Days of Buyer's receipt of this confirmation shall be deemed acceptance of this confirmation, absent manifest error.

PPL ENERGYPLUS, LLC

By: _____
Name: _____
Title: _____
Date: 10/9/07

Deidro L. Bilger
Trading Controls Analyst
610-774-2813
Fax: 610-774-7413

SARACEN MERCHANT ENERGY LP

By: _____
Name: _____
Title: _____
Date: 10/10/07

Michael R. Kutsch
Chief Operating Officer

# EXHIBIT D

OCT-10-2007 WED 01:29 PM                          FAX NO.                          P. 01/03

OCT-09-2007 TUE 11:18 AM                    FAX N

**COPY**

8013

EMISSION ALLOWANCES TRANSACTION CON

Trade Date: August 7, 2007
To: Saracen Merchant Energy LP
Attn: Emission Allowances Confirmations
From: PPL EnergyPlus, LLC
PPL Reference Number: 07EMIS0011
Buyer Reference Number:

PPL EnergyPlus, LLC ("Option Seller") hereby confirms the transaction ("Transaction") originally orally concluded on the 7th day of August, 2007, by and between Option Seller & Saracen Merchant Energy LP (Option Buyer). Seller and Buyer are each a "Party" and collectively the "Parties". This confirmation constitutes a "Confirmation" as referred to herein, and supplements and forms a part of, the ISDA Master Agreement and Credit Support Annex entered into between Seller and Buyer dated as of July 31, 2007 as amended and supplemented from time to time (the "Agreement").

Option Buyer has purchased the right, but not the obligation, to sell and deliver the Annual Allowances (as defined herein) specified below, and upon Option Buyer's exercise of such option, Option Buyer will have the obligation to sell and deliver, and Option Seller (Counterparty) will have the obligation to purchase and receive such Annual Allowances under the following terms and conditions:

Strike Price: 4500.00 USD per Allowance

Quantity: 500 Allowances

Premium: 510.00 USD per Allowance payable by Option Buyer to Option Seller two (2) business days after the Trade Date or after receipt of invoice from Option Seller.

Option Exercise: One time exercise by verbal notice no later than the Option Expiration Date.

Option Expiration Date: 1:00 pm Eastern Prevailing Time on December 15, 2008.

In the event this option is not exercised by the Option Expiration Date, Option Seller shall be relieved of its obligation to pay for and receive the Annual Allowances.
          OPTION
1. Buyer: Saracen Merchant Energy LP
          OPTION
2. Seller: PPL EnergyPlus, LLC

3. Quantity: 500 annual allowances ("Annual Allowances") of the Vintage Year set forth below. An Annual Allowance means the authorization from the Environmental Protection Agency ("EPA") or any successor agency with similar jurisdiction, pursuant to the Clean Air Interstate Rule promulgated March 10, 2005, and adherent to the Federal Implementation Plan ("FIP") Annual NOx Cap and Trade Program approved by the EPA, 40 CFR Part 97, 70 FR 25162, to emit one ton of nitrogen oxide ("NOx") in a calendar year, beginning 2009.

4. Vintage Year: 2009

5. Contract Price: US Dollars 4500.00 per Annual Allowance, for a total purchase price of US Dollars ~~6,250,000.00.~~     $ 2,250,000

6. Annual Allowance Transfer Date: On or before December 18, 2008.

7. Transfer, Payment and Taxes:

7.1 (A) On or before the Annual Allowance Transfer Date, Seller shall effect delivery of the Annual Allowances to Buyer (from and to the accounts referenced below). For purposes hereof, delivery shall mean (i) when Seller has completed and submitted to the EPA an Allowance Transfer Form ("ATF") transferring the subject Annual Allowances from Seller's Account in the Allowance Tracking System ("Allowance Tracking System") means the system established by the EPA, including its regulations and procedures, for recording the transfer of allowances among various entities or person under the Clean Air Act as set forth in 40 C.F.R. PART 97) to Buyer's account in the Allowance Tracking System or (ii) when, in

OCT-10-2007 WED 01:29 PM                          FAX NO.                          P. 02/03

OCT-09-2007 TUE 11:19 AM                          FAX NO.                          P. 02/03

## EMISSION ALLOWANCES TRANSACTION CONFIRMATION

the event that any of Buyer's information and/or authorization, including its authorized signature, is not on file with EPA, Seller submits the partially completed ATF to transfer the subject Annual Allowances to Buyer for Buyer's completion and submission to EPA. Title to the Allowances purchased and sold hereunder shall transfer from Seller to Buyer upon delivery of the Annual Allowances free and clear of any liens, other encumbrances or title defects

Seller EPA ATF Account: 999900000390
Seller Representative ID: 602901/Ann Fiore

Buyer EPA ATF Account: 9999 00000557
Buyer Representative ID:  500447  Kim Theriot

(B)  Within three (3) business days of written, facsimile or electronic notification from Seller to Buyer that the Annual Allowances have been transferred from Seller to Buyer, as indicated on the Allowance Tracking System, Seller shall forward an invoice to Buyer (a) providing evidence of the recordation of such transfer, and (b) detailing the amount owed for all Annual Allowances delivered at the Contract Price and payment instructions. Buyer shall make payment within three (3) business days of receipt of a proper invoice.

7.2  If Buyer or Seller receives notification from the EPA of non-recordation of the transfer contemplated by an ATF for this Transaction, the Parties shall promptly confer regarding such non-recordation and submit to the administrator another ATF with respect to such transfer.  Each Party shall promptly furnish to the other Party any claim concerning an error in recording transfer information in respect of any Allowances transferred pursuant to this Agreement that such Party intends to submit to the Administrator. Each Party shall cooperate with the other Party in connection with and shall have the right to participate in any proceedings concerning such claim of effort, including any administrative appeals.

7.3  Each of Buyer and Seller shall be responsible, and shall indemnify the other, for any taxes or fees (including brokers' fees) for which it is responsible associated with its purchase or sale of Annual Allowances under this Transaction.

Payment Terms: Buyer shall remit payment to the account as specified below and according to the Seller's settlement instructions:

| Banking Information: | Notices: | Settlement: |
|---|---|---|
| Mellon Bank, N.A. One Mellon Bank Center Pittsburgh, PA 15258-0001 | PPL ENERGYPLUS, LLC Two North Ninth Street Allentown, PA. 18101-1179 ATTN: Contract Administration, GENPL7 FAX: (610) 774-5077 PHONE: (610) 774-2833 | Attn: Billing (GENPL7) Invoice Fax: (610) 774-4511 Invoice Phone:(610) 774-5485 |
| Bank Account No.: 2-964-823 ABA Routing No.: 031000037 | | Saracen Info! Account Name: Saracen Energy LP Bank Name: JP Morgan Chase Bank, N.A. ABA Routing Number: 021000021 Account Number: 707552741 |

8.  Exclusive Remedies for Failure to Purchase or Receive Annual Allowances: Contact: Stefanie Peterson
Speterson@saracenenergy.com (713)366-7038

Seller Remedies for Failure to Purchase. If Buyer fails to purchase and receive all or part of the Quantity of Annual Allowances pursuant to this Transaction, and such failure is not otherwise excused under the terms hereof or Seller's failure to perform, then Buyer shall pay Seller an amount equal to the to the sum of (i) the purchase price for any Annual Allowances delivered to Buyer for which Seller has not been paid, if any, plus (ii) the positive difference, if any, between (a) the total purchase price set forth in this Transaction for all remaining Annual Allowances to be delivered pursuant to this Transaction and (b) the reasonable resale price of the Annual Allowances not purchased, or if such a resale is not possible, then the aggregate market price of such undelivered Annual Allowances as of the date of such failure to purchase, to be determined based upon the average of two quotes from brokerage firms or third-party intermediaries reasonably selected by Seller, plus (iii) any brokerage fees and other costs reasonably incurred by Seller in terminating any arrangement pursuant to which it hedged its obligations or entering into any replacement transactions. If Buyer has already made a partial payment to Seller, the amount owed under this provision will be decreased by that amount already paid.

OCT-10-2007 WED 01:30 PM                    FAX NO.                    P. 03/03

OCT-09-2007 TUE 11:20 AM                    FAX NO.                    P. 03/03

## EMISSION ALLOWANCES TRANSACTION CONFIRMATION

**Buyer Remedies for Failure to Sell.** If Seller fails to sell and deliver all or part of the Quantity of Annual Allowances pursuant to this Transaction, and such failure is not otherwise excused under the terms hereof or Buyer's failure to perform, then Seller shall pay Buyer an amount equal to the sum of (i) the positive difference, if any, between (a) the reasonable price of purchasing replacement Annual Allowances, or if such a purchase is not possible, then the aggregate market price of such undelivered Annual Allowances as of the date of such failure to sell, to be determined based upon the average of two quotes from brokerage firms or third-party intermediaries reasonably selected by Buyer, and (b) the total purchase price set forth in this Transaction for all remaining Annual Allowances to be delivered pursuant to this Transaction, but which Seller failed to deliver, plus (ii) any brokerage fees and other costs reasonably incurred by Buyer either in terminating any arrangement pursuant to which it hedged its obligations or entering into any replacement transactions.

9.  **Government Action.** If the rules or regulations establishing the annual NOx program eliminate the Annual Allowances, then either Party may terminate this agreement upon written notice to the other Party.

10. **Special Provisions:** This confirmation and the terms of this Transaction shall only be modified pursuant to a written agreement signed by the Parties. In the event of any inconsistency between this confirmation and the ISDA Master Agreement, the provisions of this confirmation will prevail for this Transaction.

11. **Other.** If the above accurately reflects your understanding of our agreement, please indicate your approval by securing execution of this confirmation in the space provided below by an authorized representative of Buyer and returning it via facsimile to Seller at 610-774-7413. Failure to object to the terms of this confirmation or respond with any objections thereto within three (3) Business Days of Buyer's receipt of this confirmation shall be deemed acceptance of this confirmation, absent manifest error.

PPL ENERGYPLUS, LLC                          SARACEN MERCHANT ENERGY LP

By: _Deidre L. Bilger_                       By: _Mill Kly_
Name: _____                       Name: _____
Title: _____                      Title: _____
Date: _10/9/07_                              Date: _10/10/02_

Deidre L. Bilger                             Michael R. Kutsch
Trading Controls Analyst                     Chief Operating Officer
610-774-2813
Fax: 610-774-7413